# SUPREME COURT

OF THE

## STATE OF MISSOURI,

AT THE

### OCTOBER TERM, 1894.

HANNA, *Appellant*, v. SOUTH ST. JOSEPH LAND COMPANY.

Division One, December 22, 1894.

| | |
|---|---|
| 126 | 1 |
| 125 | 422 |
| 126 | 1 |
| 138 | 231 |
| 138 | 281 |
| 126 | 1 |
| 152 | 656 |
| 126 | 1 |
| 159 | 405 |
| 86a | 378 |
| 126 | 1 |
| 171 | ¹688 |
| 176 | ³596 |

1. **Supreme Court:** JURISDICTION: CANCELLATION OF DEED OF TRUST. An action to cancel a deed of trust conveying real estate involves title, under the Missouri precedents, and comes within the reviewing jurisdiction of the supreme court.

2. **Contract, Construction of.** A contract "to transfer" the "works" of a nail manufacturing company, from Omaha to St. Joseph, does not require the removal of every identical structure of the old establishment to the new location.

3. ———: INTENTION OF PARTIES. The prime rule for the construction of contracts is that the intent of the parties, as disclosed by their language, be given effect.

4. ———: ———. The subject-matter and circumstances of a contract should be considered in discovering the intent of the contracting parties in case of any uncertainty of meaning.

5. ———. If ambiguous expressions appear in a contract, the effect to be ascribed to them must, if possible, be a reasonable one.

6. ———. The meanings of the words "transfer" and "works" discussed.

7. **Supreme Court Practice**: EQUITY CASE: EVIDENCE. When certain testimony, presented in the record, was excluded in the trial court, it may be admitted and considered by the supreme court, on appeal in an equity cause, without a reversal for a new trial.

*Appeal from Buchanan Circuit Court.*—S. P. HUSTON, *Esq.*, Special Judge.

AFFIRMED.

*Spencer & Mosman, B. R. Vineyard* and *Jas. F. Pitt* for appellants.

(1) The words "to transfer its works" used in the contract of purchase have been defined by this court, and held to mean that the land company was bound by them to cause the buildings and machinery of the Omaha plant to be removed from Omaha and to be set up in place in St. Joseph. This meaning is quite apparent when we reflect that distance does not affect it. *South St. Joseph Land Co. v. Pitt*, 114 Mo. 135. (2) It will hardly be contended that the works in St. Joseph are the Omaha works in any sense. The mill there was an iron nail mill, and that in St. Joseph a steel nail mill, one that required in its equipment essentially different machinery and appliances, and which was built to produce an entirely different product. This being true there can be no claim of substantial performance. Where there is a "willful or intentional departure" from the contract, as in this case, an avowed substitution of one thing for another, there can be no such thing as substantial performance. *Philip v. Gallant*, 62 N. Y. 264. (3) The departures from the Omaha works being shown, the court erred in excluding the circular, the contract of the land company with the nail company, and the admissions of Mr. Walker to the effect that they could have "opened up on the small scale first proposed but wanted something

bigger," and had enlarged their plans so as to increase their expenditures more than $60,000. (4) From the course of their cross-examinations as well also as from the testimony introduced by defendant's counsel, it is manifest that the theory of the defense is that they gave to the plaintiffs not what they wanted or contracted for, but something which, in their judgment, is vastly superior in every respect. But this they can not do. *Halpin v. Manny*, 33 Mo. App. 388; *Bixby v. Wilkinson*, 25 Minn. 481; *Fauble v. Davis*, 48 Iowa, 466. (5) Sustantial performance, it is true, is all that is required to satisfy any such agreement, and it may also be conceded that in the adjudication of controversies growing out of building contracts slight differences in the dimensions between the buildings constructed and the terms of the contract may, under many circumstances, be overcome by a reasonable application of that rule, but the differences in the case before the court are far too great to fall within that principle, as the effect would be to make a new contract and substitute it in the place of the stipulation executed by the parties. *Swain v. Seamens*, 9 Wall. 262.

*Hall & Woodson, T. J. Porter* and *M. A. Reed* for respondents.

(1) The land company was not required to cause the removal of the exact buildings. *South St. Joseph Land Co. v. Pitt*, 114 Mo. 139. (2) The court did not err in excluding the circular, the contract of the land company with the nail mill company and certain admissions of Mr. Walker. (2) It is a familiar principle of law that all prior and contemporaneous conversations between parties are merged in a subsequently executed written contract, which shows on its face that it is a contract complete in itself. The land contract, there-

fore, which was afterward entered into between these parties, is the only evidence of that contract. This, where no fraud is alleged (and none is here alleged) is the well established rule of this court. *James v. Clough,* 25 Mo. 151; *Morgan v. Potter,* 103 Mo. 135; *State ex rel. v. Hoshaw,* 98 Mo. 358; *Woodson ex rel. v. Ritchie,* 36 Mo. App. 506; *Tracy v. Iron Works,* 104 Mo. 193; *Christman v. Hodges,* 75 Mo. 413; *Pearson v. Carson,* 69 Mo. 55; *Reed v. Golden,* 26 Kan. 502; *Miller v. Howell,* 1 Scam. 498. (3) The offer was to show that the agent made the representations contained in the circular, and yet every one of those representations as set out in the petition was promissory in character, about something *in futuro,* something that would be done. Such representations afford no ground in equity for the rescission of a contract. *Voorhis v. Iron Works,* 11 Mo. App. 112; *Sawyer v. Pickett,* 19 Wall. 146; *Banque v. Brown,* 34 Fed. Rep. 192. (4) The whole evidence in the case shows that the St. Joseph nail mill plant, as erected by the nail mill company, complied substantially and even fully with their contract stipulations. In number of buildings, in size, in capacity, in equipment and efficiency, no fault has been shown in the plant. No deficiencies in these respects are now charged in counsels' brief. They only complain of merits. We can justly claim, not only a substantial compliance with our contract, but a full compliance. *Mfg. Co. v. Mitchell,* 38 Mo. App. 322; *Weintz v. Hafner,* 78 Ill. 22.

BARCLAY, J.—Plaintiffs brought the present suit to cancel certain notes executed by them to the land company, as well as a deed of trust given to secure the notes.

The land company, defendant, answered; and by way of counterclaim, set up facts upon which fore-

closure of the deed of trust was asked, as also a judgment against plaintiffs for the amount of the debt and interest represented by the notes, etc.

The reply denied the new matter.

It will not be needful to go into the pleadings more fully. They are quite elaborate; but, as will soon be seen, the real controversy lies within narrow limits.

The litigation grows out of a transaction similar to that considered in *South St. Joseph Land Co. v. Pitt* (1893), 114 Mo. 135. In that case, a purchaser of a lot was defendant at the suit of the company for the purchase money; in this, the plaintiffs are seeking to be reimbursed what they paid on a like contract of sale, and to obtain cancellation of the notes and deed of trust, which formed important parts of the transaction.

In the case at bar the trial court dismissed the plaintiffs' petition, and then proceeded to render judgment on the notes, and for a foreclosure of the deed of trust, as prayed in the answer.

The plaintiffs then appealed in proper form.

The contracts of purchase in this, and in the former appeal (reported in the 114th Missouri Reports) are substantially the same.

The following is a sufficient sketch of the material features of the controversy:

In the summer of 1888, the South St. Joseph Land Company owned a body of real estate in the southern portion of the city of St. Joseph. The Union Steel Nail Company owned a plant in Omaha, Nebraska, for making iron nails. It was then idle, having been closed for about a year. It was intact, however, and substantially in the same condition as when operation ceased. This plant occupied a block, between Sixteenth and Seventeenth streets in Omaha, next north of

the Union Pacific Railway tracks.   The main building on the south side of the ground (including sheds, and attachments of that character, all practically under one roof) covered a space of about one hundred by one hundred and seventy feet.   Apart from this building were five separate buildings—an office, coopershop, blacksmithshop, patternshop and barn.   These were frame buildings, with shingle roofs.   The main building was a wooden affair, covered with sheet iron.

All of these structures were one story in height.

The machinery of the plant was in the main building, and the heavy portion of it (nail machines, roll-trains, engines and boilers) rested upon massive foundations of stone masonry, six to eight feet in depth.

A battery of four boilers stood south of the center of the building.

In the east end were the trains of rolls, with their engines and two pairs of "alligator shears."

To the northwest of the boilers, were the nail machines, thirty-two in number, their engines, and a complement of grindstones.

In the south part of the main building were the three heating furnaces, and, in the northwest corner, what was called a machineshop, with a small engine. In the west part was a packing and wareroom.

The plant as it stood at Omaha was outwardly represented by six buildings.   It was equipped for making iron nails, and had a capacity of three hundred kegs a day.

Mr. Haven and Mr. Walker appear to have been the real owners of the property at the time mentioned.

They desired to abandon that location, and addressed the South St. Joseph Land Company, or at all events, the two came together, and the land company was induced to offer its lands to the citizens of

St. Joseph at such prices per lot as would enable it to donate four blocks of the ground as a site, and pay to Messrs. Haven and Walker (under the name of the "Union Steel Nail Company, of Omaha, Nebraska,") $50,000 in cash, if the latter would transfer their works from Omaha to St. Joseph.

This proposition to remove was formulated by the land company; and its agents were furnished with blank contracts, such as the one signed by the plaintiffs in this case. These agents pressed the sale of the lots with the Omaha works attached (that is to say, the sales were not to be good unless those works were on the site proposed) during July and August, 1888; and by the latter part of August succeeded in inducing enough citizens to sign contracts to make it profitable for the land company to take the next step, which was to enter into contract, September 4, 1888, with the nail company to convey four blocks of land and pay it $50,000 to locate its works thereon.

This contract was carried out.

The nail company entirely discontinued operations at Omaha. It removed everything, considered worth transportation, to the new mill at St. Joseph, including the greater part of the machinery.

Without going into details, it expended $20,000 for new buildings on the St. Joseph site, and at least $40,000 for new and improved machinery for making nails. It erected an establishment which, counsel concede, was "bigger and better" than the old one at Omaha. It added to its old appliances a large four hundred horse power engine, eighteen nail machines, two pairs of plate shears, twelve or thirteen grindstones, a plate re-heating furnace, and a large number of other improved means for the prosecution of the business.

The new establishment was adapted to the manu-

facture of both steel and iron nails, whereas the old mill had turned out only iron nails.

The nail company removed many parts of the Omaha mill to St. Joseph. It did not, however, bring over the masonry foundations for some of the machinery; nor did it bring over some other items of the old plant, notably its small brick office, fourteen by sixteen feet square, which, at the time of the trial, was in use by a coal company as its office. At the St. Joseph works a new office building was erected about eighteen by twenty-four feet square, having a brick vault and a tin roof.

Toward the close of the summer of 1890 the new nail mill at St. Joseph was finished and ready for business. It was in operation for about six weeks, until November in that year, when it ceased for lack of sufficient funds.

It will not be necessary to go further into details of the evidence.

The decisive point of the controversy is found in the construction of the original contract, which plaintiffs signed at the outset.

It formed, as they claim, the basis of their notes and deed of trust. Granting (though not deciding) that the latter depend on the former, the question remains, did the land company meet the conditions of that preliminary agreement, namely:

"St. Joseph, Mo., August ——, 1888.

"We hereby agree to purchase from the South St. Joseph Land Company, of St. Joseph, Missouri, lots numbers 2 and 10, in block 102, in South St. Joseph addition to St. Joseph, Missouri, and to pay said company therefor the sum of $1,780, one third in hand when the Omaha Steel Nail Company shall have their main buildings under roof, and the balance in one and two years from that time, at eight per cent. interest, for

which said company agrees to make warrantee deed and furnish abstract.

"This agreement to be in force if said land company shall cause the Union Steel Nail Company, of Omaha, Nebraska, to transfer its works from said Omaha and locate the same on said company's land in said addition, by a donation of four blocks of land therein and $50,000 in money, or by any other proposition upon which said parties shall agree to locate on said property, failing in which, this agreement to be void."

1.   Before entering upon the merits, it is proper to remark that we have considered the preliminary question of the jurisdiction of the supreme court to entertain the case.   The pecuniary amount is not sufficient to bring it within the reviewing power of this court under the constitution.   Const., 1875, art. 6, sec. 12.   If it belongs here, it must be on the basis that it involves title to real estate.

The object of plaintiffs' suit is to rescind their contract to purchase the land, and to cancel the deed of trust, conveying the same real property to secure the notes given on that account.

On the defendant's side, the answer is simply a bill to foreclose.

In *Keane v. Kyne* (1877), 66 Mo. 216, this court (without question) took jurisdiction of an appeal involving the cancellation of an alleged forged deed to real estate, as it did likewise in a later case wherein the jurisdictional point was considered quite fully. *Dunn v. Miller* (1888), 96 Mo. 324.

In *Nearen v. Bakewell* (1890), 40 Mo. App. 625, the St. Louis court of appeals transferred a cause to the supreme court, the gist of which was to obtain cancellation of certain notes and a deed of trust on the ground of fraud in the transaction wherein the notes and deed

were given. The question of jurisdiction was fully discussed in the appellate court judgment just cited. When the case reached this court, it was considered and determined on its merits. *Nearen v. Bakewell* (1892), 110 Mo. 645. That judgment implied a ruling on the jurisdiction, particularly in view of the stress laid upon that subject in the appellate court opinion upon which the case was sent here.

In *Gardner v. Terry* (1890), 99 Mo. 523 (a suit to enjoin a sale by defendants under a deed of trust, which the plaintiff, who was in possession, alleged was barred by adverse possession under the limitation law), it was held that this court had jurisdiction on the ground that title was involved.

From these rulings it would seem to follow that, where a muniment of title to real estate is directly assailed and sought to be canceled, this court has jurisdiction, and hence the present case should be retained for adjudication here.

2. Plaintiffs contend that the words "to transfer its works," as used in the first contract, mean that the land company was bound to cause the identical buildings and machinery of the Omaha plant to be removed from Omaha and to be set up in St. Joseph.

If that contention is correct, the contract was not complied with. The Omaha buildings were dismantled—some of them razed to the ground; but there was no effort to bodily transfer each to the new location; though a great amount of the old machinery was actually transferred, and set up for use at St. Joseph.

An able and ingenious argument has been submitted by counsel, and very faithful and laborious research has been brought to bear upon the case to maintain that contention, but yet it seems to us untenable. Counsel for appellants rely in great measure on some remarks of the learned judge who delivered the

opinion in the case already cited, arising out of the same events; and especially on the following passage from his opinion, viz.:

"The main buildings being under roof and the Omaha works that is to say the building and machinery moved upon these lots and put in place, the parties to this contract each for himself took the risk that the works would be put in operation." (p. 141.)

In that case the court was considering whether "works" meant a going concern, employing one hundred and fifty men and producing five hundred kegs of nails per day. It was held that the word did not bear that meaning.

The above quotation shows on its face that the idea now advanced by plaintiffs was far from the mind of the writer of that opinion, and far from receiving the sanction of the court. The "main building" then mentioned was the new building. It was not the identical main building of the Omaha mill, but a substitute for it, erected in St. Joseph, for the same general purposes. Nothing said in that case was intended to countenance the supposition that the contract which plaintiff signed could be performed only by moving the identical plant in all its entirety, buildings, machinery, foundations, etc., to the St. Joseph site, in the same shape it had at Omaha.

The prime rule for the construction of contracts is that the intent of the parties (as contained in the language used by them) shall be given effect. That intent it is the chief purpose of interpretation to discover. There are many recognized rules to aid in that discovery in legal proceedings, among them those which require the interpreter to consider everything within the four corners of the document, and permit the circumstances in which it originated to be taken

into account in ascertaining what was probably intended by it.

The contents of the writing in question are very brief in form, and little more than an outline of agreement, though the subject-matter is by no means trivial.

The paper contains a promise to pay $1,780; upon certain conditions, as well as the terms which refer to the transfer of the works.

It is evident that a contract, dealing with such a subject so briefly, could not be expected to express the common purpose or intent of its authors with much completeness. The few words used to put an agreement of that kind into binding force are rather to be considered in a large, than in a narrow, sense if they are in any wise ambiguous.

Looking to the surroundings of the contract, it is apparent that the main purpose of the scheme in which the plaintiffs and defendants were interested, either as citizens or as promoters, was to enhance the value of real estate in that part of the city of St. Joseph by securing the location of a large manufacturing plant there. This was the paramount idea behind the memorandum, as disclosed by the circumstances. The location of the works in St. Joseph was the leading object in view; as is very clearly indicated in the closing lines wherein the plaintiffs consent to "any other proposition upon which said parties" (meaning the nail company) "shall agree to locate on said property—failing in which, this agreement to be void."

Some light is cast on the controversy by the first part of the agreement where plaintiffs stipulate to pay "one third in hand when the Omaha Steel Nail Company shall have their main building under roof." This language, read in connection with the closing words, stipulating that the nail company shall "locate on said property," seems to indicate that the parties

contemplated some new buildings to be erected on the new site, rather than that the old ones should be bodily removed to it.

3. An appeal is made by plaintiffs to the derivation of the word "transfer," and its meaning is said to be "to carry across," "to bear over from one place to another." These meanings are, no doubt, often intended by its use. But it does not follow that such is the meaning intended by the parties who used it in the paper now in view. It has many broader meanings both in the language from which we derive it and in our own. The subject-matter to which it relates must be considered, in determining what was actually intended in this instance.

It should be construed, moreover, so as to produce a reasonable effect.

"Ambiguous words or expressions, are sometimes capable of too senses, and will produce some effect in either of the two. The rule then goes farther and says that the effect must be a reasonable one. No other effect can be supposed to have been in the speaker's or writer's intention, because no man can be supposed to intend what is absurd or unreasonable. We meet with an example in Puffendorf, which belongs rather to this head, than to that under which he mentions it. Labeo having agreed, by a league with Antiochus, that the latter should give up half his fleet, cut every ship in two. The words would, perhaps, admit of this construction, and would certainly produce some effect, if they were thus construed. But it is such an effect as can never be supposed to have been in the mind of Antiochus, when he agreed to these conditions; because it is an unreasonable and absurd one. If the words will admit of this meaning, yet it could not be his meaning; by agreeing to part with half his fleet, he can not be supposed to have consented that the half, which

he parts with, should be understood in such a sense as would, in effect, deprive him of the whole." Rutherforth's Insts. [ 2 Am. Ed. ], p. 413.

Would it, in the case at bar, be reasonable to suppose that these parties intended by their words to agree that the Omaha "works" should be bodily removed to St. Joseph?

The answer depends, in some measure, on the meaning to be given to the subject-matter of the agreement to transfer. The thing to be transferred was the "works" of the nail company.

The word "works," in its primary sense, denotes actions rather than things. In that sense we find it employed in very ancient scriptures. Deut. 3:24; Psalms 33: 4 and 143:5; Heb. 9:14; Rev. 14:13 and 20:12.

In the same sense it is found in the statute law of to-day. R. S. 1889, sec. 3852.

But it has many other, and some very wide, meanings.

In *Richmond v. Railroad* (1872), 21 Grattan, 608, it is said:

"The word 'works' is one of very extensive signification. In military engineering, it means fortresses, fortifications, ramparts, bastions and the like. In civil engineering it is often applied to depots, engine-houses, bridges, embankments and other structures essential to the franchise and the proper conduct of a railway, or other work of public improvement."

In *Queen v. Railroad* (1855), 4 El. and Bl., *p. 958, a railway line was held to be "works"; and in *Martyn v. Williams* (1857), 26 L. J. Ex. 117, pit-pans and levees, belonging to a clay mine, were held to come within the scope of the same word.

In *Brannigan v. Robinson* (1892), 1 Q. B. Div. 344, walls remaining in place during the taking down of a

building were held to be "works" within the meaning of the English Employers' Liability Act.

Beyond these adjudications elsewhere, showing the broad range of meanings embraced within that term, the word was defined by this division of the court as "an establishment for manufacturing, or for performing industrial labor of any sort; generally in the plural, including all the building, machinery, etc., used in the required operations, as iron works." *South St. Joseph Land Co. v. Pitt* (1893), 114 Mo. 140.

In the sense of an establishment for the manufacture of nails, the word was used in the contract before us. In that sense it is of frequent use at the present time, especially among men connected with such concerns.

When the parties to this cause wrote of a transfer of such "works" as a nail manufactory, can they justly or reasonably be held to have intended the same sort of a transfer as would have been meant had they agreed to transfer to St. Joseph a box of goods or some other article of specific personal property? The subject-matter of the contract, no less than the general purpose of it (as suggested by its closing words and developed by the circumstances) forbids such an interpretation.

The word "transfer" must be construed with a due regard to its reasonable and natural meaning as applied to the thing to be transferred.

If one agrees to transfer to another a piece of real estate, rational interpretation will at once determine that a transfer of the title, not the body of the land, is intended.

The word "is one of the widest terms that can be used," said JAMES, L. J., in *Gathercole v. Smith* (1881), 50 L. J., Ch. 672.

As applied to title, it is of varied and extensive

meaning. 2 Coke's Inst., Ch. 24, *p. 406 (3); *Bank v. Lawler* (1878), 46 Conn. 243.

As applied to a manufacturing establishment, we need not attempt to define its exact significance. It is enough to say that we consider the sort of "transfer" of the manufacturing concern in question from Omaha to St. Joseph, which has already been described, as a compliance with the agreement to "transfer" the "works."

4. Some questions as to the admissibility of certain evidence which the trial court excluded, have been raised. We think it needless to discuss them, for, even if we admit all the items of proof which were ruled out (as might properly be done here in a case such as this, without a reversal, *Barrett v. Davis* (1891), 104 Mo. 549), the result must be the same in the view which we have taken of the case.

We should have been content to dispose of this appeal in a much more summary manner, but for the earnest and industrious efforts of plaintiffs' counsel, in their able briefs presented, to lead us to a different judgment from that which we are about to announce; and but for the further fact (suggested to the court at the argument) that a number of cases, involving the same issue, are pending in the circuit court to be determined by the ruling made on this appeal.

The learned trial judge was entirely correct in the interpretation given to the first contract of these parties. That ruling being sound, it is wholly unnecessary to go into other phases of the case, or into the details of the exceptions taken at the trial. The circuit judgment is manifestly for the right party; and is hence affirmed. BLACK, C. J., and BRACE and MACFARLANE, JJ., concur.