# SAMUEL FELLER, Appellant, v. J. LUTHER LEE.

### In Banc, February 2, 1910.

1. **TAX SALE: Wrong Name.** Where the entryman was Thomas M. Kean, a sale based on a judgment for taxes against Thomas McKean conveyed no title.

2. **———: Neither Actual Nor Record Owner.** Where Rylett sold the land in March, 1891, by deed recorded April 23, 1892, a tax sale under a judgment against Rylett as owner bearing date March 28, 1896, followed by a tax deed dated September, 1896, conveyed no title, nor color of title.

3. **LIMITATIONS: No Claim of Ownership.** Possession alone is not sufficient to give title, however long. To finally ripen into a good title under the Statute of Limitations it must be under claim of ownership. A trespasser, in possession under no claim of ownership or title of any degree or character, admitting himself to hold by wrong and not by right, cannot acquire title by limitations.

4. **EJECTMENT: On Strength of Plaintiff's Title: Common Source.** Where there is a common source of title, either admitted or shown to exist, the rule that plaintiff in ejectment must recover upon the strength of his own and not on the weakness of defendant's title, does not apply as to infirmities in the title anterior to the common source. So that where plaintiff claims as grantee of Rylett, and defendant under a tax deed and judgment against Rylett, it is immaterial whether Rylett ever really had any title or not; but the point for decision is, did plaintiff or defendant acquire what Rylett owned, whatever it was?

5. **———: ———: Possession: Limitations.** And where defendant, after acquiring such tax deed, went into possession under his deed, he is presumed to continue to hold under such deed, and cannot by mere change of mental attitude change his possession into that of a trespasser.

6. **———: Outstanding Title: Redemption.** In order for a defendant in possession to defeat plaintiff in ejectment by a showing of an outstanding title in another, he must show a legal title. An outstanding equitable title, in another, such as the right of redemption, is not sufficient, especially where no equitable defense is pleaded.

7. **DEED OF TRUST:** The Then Sheriff: Sheriff as Second Party. The deed of trust named the "sheriff of Webster county" as party of the second part, or his successors in trust, and provided that in case of default in payment of the principal or interest or taxes the whole of the indebtedness "at the option of the holder" should forthwith become due and payable, and "the said party of the second part, or in case of his absence, death, refusal to act, or disability in any wise, the then acting sheriff of Webster county, at the request of the legal holder of said note or any of them, may proceed to sell," etc. *Held*, first, that a sale by the sheriff in office at the time the sale was made and his deed in pursuance thereof, carried the legal title; and, *second*, the language used did not mean the sheriff in office when the deed of trust was made, nor the sheriff in office when default in payment was made, but it meant the sheriff in office when the holder of the notes requested the property to be sold. [Distinguishing McNutt v. Life Ins. Co., 181 Mo. 94.]

Appeal from Webster Circuit Court.—*Hon. Argus Cox,* Judge.

REVERSED AND REMANDED (*with directions*).

*J. P. Smith, C. A. Newton, M. H. Winger* and *Karnes, New & Krauthoff* for appellant.

(1) The circuit court properly held in the trial of this case that, since defendant had continually claimed title by virtue of his said tax deed and said tax deed came from a common source with plaintiff's claim to title, and since defendant, in case judgment was entered in his favor, could properly have come into court after September 21, 1906, and pleaded his peaceable, adverse possession for a period of ten years under a claim of title based upon his said tax deed, he could not for the purpose of this case waive his claim to title under said tax deed and plead his possession alone, but that since he and plaintiff had continually claimed under a common source of title, defendant must stand or fall upon that title. (2) Defendant contends that inasmuch as the words "to his successor or successors," which follow the words "par-

ty of the second part'' in the habendum clause of the trust deed in question, do not appear in the granting clause, there exists a repugnancy, and that the granting clause must govern and that no one could become trustee except the sheriff of Webster county, Missouri, who was acting at the time said deed of trust was executed. If defendant's contention is the law, then the court erred when it decided in the McNutt case, that the acting sheriff of Jackson county, at the time Roland R. Conklin disqualified, became the trustee, for the reason that the granting clause in that case mentioned no one as trustee except Samuel M. Jarvis. It is evident in the case at bar, that the habendum clause is not repugnant to, but explanatory of, the granting clause. Plaintiff contends that under a reasonable and sensible construction of the deed of trust, in the case at bar, said deed was properly foreclosed and that said foreclosure in no way conflicts with the doctrine laid down in the McNutt case and that the intention of the parties was properly carried out. But even if there was any doubt as to the intention of the parties and more than one construction were possible, then that construction should be adopted which would make said deed of trust effectual and not defeat it.

LAMM, J.—The suit is ejectment. On a trial, without the aid of a jury, judgment went for defendant, and the cause is here on plaintiff's appeal.

Ouster is laid as of March 2, 1905. Other averments of the petition are conventional. The land in dispute is the East one-half of the Southwest quarter of section 4, township 28, range 17, Webster county. The answer admits possession and denies other averments.

Plaintiff's case on the proofs and admissions is this:

(1) An admission in open court that defendant was in possession.

(2) A quitclaim deed from John Rylett to I. S. Wilson, dated March 24, 1891, recorded April 23, 1892.

(3) A warranty deed from I. S. Wilson to Geo. B. Hayes, dated September 1, 1894, recorded September 5, 1894.

(4) A warranty deed from Geo. B. Hayes to E. Lemphere, dated September 4, 1894, and recorded two days later.

(5) A deed of trust from E. Lemphere, party of the first part, to the "sheriff of Webster county, Missouri," party of the second part—Geo. B. Hayes, party of the third part, beneficiary, securing a principal note for $600 due in five years from September 5, 1894, and five annual interest notes for $48 each. (Plaintiff's title hinging on a foreclosure of this deed of trust, its narrations will receive attention hereafter. For convenience it will be called 'A.'') Dated the 5th of September, 1894, and recorded one day later.

(6) A trustee's deed foreclosing A from H. S. King, sheriff of Webster county, Missouri, to E. R. Durham, dated May 9, 1903, recorded September 29, 1904. (Some of the narrations of this deed are pertinent to points considered and will receive attention later. For convenience this deed will be called "B.")

(7) A quitclaim deed from E. R. Durham to "Dan F. Blake," dated February 10, 1904, and recorded March 23, 1904.

(8) A trustee's deed in bankruptcy from Daniel F. Blake as trustee to Samuel Feller, plaintiff, dated January 23, 1905, recorded two days later. This deed recited, *inter alia,* that said Blake was elected trustee in bankruptcy of the estate of Robinson Implement Company; that as such trustee he was ordered by the referee in bankruptcy to sell the assets of the bankrupt estate, including the land in question; that in pursuance of said order he sold the land to Feller, and, by virtue

of the power of authority in the order of the sale, conveyed it to him.

(9) A quitclaim deed from "Dan F. Blake" to plaintiff dated February 18, 1905, recorded September 26, 1905.

(10) It was admitted that the note secured by A (Hayes, payee, and Lemphere, payor,) at the time of the foreclosure belonged to the bankrupt estate of Robinson Implement Company; that E. R. Durham (purchaser under B) was at the time acting as temporary receiver of the said Implement Company, and that he purchased at the foreclosure sale for the benefit of said bankrupt estate; it was shown by plaintiff's testimony and not contradicted that the deed from Durham to "Dan F. Blake" (No. 7) was made to said Blake in his capacity as trustee of said bankrupt estate; that plaintiff purchased at the sale of the assets of the bankrupt estate and received a trustee's deed (No. 8) and that Dan F. Blake subsequently quitclaimed to plaintiff in order to convey the record title put in him by No. 7.

(11) It was admitted that the rents and profits were of the value of $2 per month.

(12) In making plaintiff's case, other admissions were made in open court, viz., that James Goss was the sheriff of Webster county, from January 1, 1893, to the thirty-first day of December, 1894; that he moved out of the county on March 1, 1900; that he moved back to the county on the 10th day of September, 1900; that he lived with his family in the county until the 16th day of March, 1903, and moved out of the county with his family on that date and has ever since resided out of it; that J. R. Ray succeeded him, his term running from January 1, 1895, to December 31, 1896; that he was succeeded by James Hailey, whose official term ran from January 1, 1897, to the end of December, 1900; that Hailey was succeeded by Julian, whose official term ran from January 1, 1901, to the end of De-

cember, 1902; and that H. S. King (trustee executing B) was the duly qualified and acting sheriff from January 1, 1903, up to and inclusive of December 31, 1904, and that he was such sheriff on the date he foreclosed A.

(13) Plaintiff also offered in evidence a tax judgment against the land, dated March 28, 1896, against John Rylett, owner, and followed that by putting in evidence a sheriff's tax deed pursuant to such judgment, conveying the land to defendants, said deed dated September 21, 1896, and recorded November 14, same year.

Defendant's case was this:

(1) He put in evidence the plat book of land entries of Webster county showing the land entered from the Government by Thomas M. Kean, under date of September 5, 1857.

(2) Next, a tax judgment dated September 30, 1878, in a suit wherein "Thomas McKean" was defendant.

(3) Next a sheriff's deed under such judgment to I. S. Wilson (grantee of John Rylett under No. 2 in plaintiff's chain of title) which said deed bore date of March 26, 1880, and was recorded the next day.

(4) Oral evidence was elicited from defendant in person to the effect that he had been in possession for nine years and six months, had fenced the land, cleared off the timber from about thirty-five acres, put that much of it in cultivation, and *"that he took possession of said land under the tax deed"* (see No. 13 in plaintiff's case made), *"but that he was claiming said land by right of possession and not by right of title."* His other testimony tended to show that neither plaintiff, nor those under whom he claims, had ever been in possession.

(5) Through the cross-examination of defendant a correspondence got into the case, the letters passing between J. P. Smith, representing the title under the

foreclosure of A, and defendant. The purpose of it was. to unite the two titles by buying or selling. ·In his letters defendant asserted that he had a tax title and wanted an offer on his own or a price on Mr. Durham's title. In one he wanted to know if an abstract and warranty deed would be made if he made an offer. In another he contrasted his own title with that held by the other side and said his was as good as theirs. In another he said he thought he had a good title, referring to his tax title.

(6) A petition in a suit to quiet title. It was entitled Dan F. Blake, plaintiff, against the present plaintiff and defendant as codefendants. The date of filing, whether summons was sued out on it, and the purpose of introducing it, are dark.

The court gave an instruction for plaintiff that the tax deed under which defendant claims was invalid, and then refused to instruct that A was properly foreclosed and that B conveyed title to Durham. Judgment for defendant on the merits following that refusal.

Defendant filed two motions here—one, to transfer to the St. Louis Court of Appeals—the other, to affirm because of no proper affidavit for appeal. Both motions were overruled. After these motions, defendant became voiceless, filing no brief.

Having the burden of showing error to reverse the judgment, plaintiff's counsel undertake to state the position of defendant as well as their own below and here. As defendant stands mute we may indulge the presumption that he is satisfied with plaintiff's statement of the contentions, *viz.*: On plaintiff's behalf that there was a common source of title, John Rylett; hence, in order to prevail, plaintiff did not have to go beyond such common source in proof of title. On defendant's behalf that there was no common source of title, that plaintiff must make out his case on the strength of his own and not on the weakness of defendant's title, hence should have traced title from the

Government. Again, on plaintiff's behalf that King was the proper sheriff to foreclose A—on defendant's behalf that he was not and therefore no title passed by B to Durham.

On the record outlined can the judgment stand? We think not. This, because:

I. Plaintiff did not trace title to the Government. The land was entered by Thomas M. Kean. Wilson purchased at a tax sale based on a judgment against "Thomas McKean." Counsel do not contend that sale and deed following conveyed the title of the entry-man, Thomas M. Kean. However, John Rylett conveyed to Wilson. The source or character of Rylett's title is not disclosed. The date of his deed to Wilson was March 24, 1891, recorded April 23, 1892. Defendant's paper title originated in a tax sale on a judgment against Rylett as owner bearing date March 28, 1896, and a tax deed following on September 21, 1896. Now if John Rylett be the common source of title, then plaintiff's title is superior to defendant's because the record title had passed out of Rylett to Wilson long prior to the tax suit, sale and deed through which defendant claims. Rylett owned nothing at that time, hence the sheriff's deed to defendant conveyed nothing. To get around a common source of title, defendant, while admitting *he went into possession under his tax deed* and while his correspondence shows he rested on his tax-deed title and proposed to dicker, sell and convey on the basis of it, yet on the witness stand he seemingly saw a great light, to-wit, that he did not hold under his tax title but by virtue of a foothold under the doctrine of "squatter sovereignty"—*pedis possessio,* pure and simple. His testimony was that he "was claiming said land by right of possession and not by right of title." By the phrase "right of possession," he could not have meant title by limitation, for limitation had not run. He must have meant a squatter's

right and nothing else. But did he really mean what he said? Let us see. On such theory, however aged his possession, he could get no title by it. This because a trespasser, a mere squatter, in possession of land, under no claim of ownership or title of any degree or character, admitting himself holding by wrong and not by right, can not acquire title by limitation at all. A possession finally ripening into a good title under the statute of limitations must have the grace of being under a claim of right or ownership. It is the bud of such "claim" that *flowers* finally into title by ten years' adverse possession. [Hunter v. Wethington, 205 Mo. 284; Sanford v. Kern, 223 Mo. 616; Hunnewell v. Adams, 153 Mo. 440; Stevenson v. Black, 168 Mo. l. c. 560 *et seq.*] So that it is quite apparent that defendant, in trying to avoid the peril of a common source of title which peril led him to repudiate holding under his tax deed, would have us believe he was holding possession as a squatter—a possession never to be blessed by any flux of time.

Let us suppose the ejectment suit had not been instituted until the ten-year limitation had run. Is it thinkable that defendant at the trial would not have claimed his *tax deed* filled an office in establishing title, that he had ownership by continuous adverse possession under claim of right and under *color of title?*

Moreover, the law presumes every possession is consistent with some title. So a presumption arises that he who goes into possession of land under a deed, as defendant admits he did under the Rylett deed, continues to hold possession under such deed. The burden was on defendant to rebut the presumption. That burden he did not well carry. No such rebuttal will arise by a mere shift in mental attitude—a shift of position newly sprung to meet the exigencies of a law suit, ephemeral in character. There must be something palpable, some unequivocal act; for, as faith is shown by

works, so defendant, if he repent of holding under his deed, must bring forth fruit mete for repentance.

We conclude there was a common source of title, to-wit, John Rylett. That being so, the infirmities in John Rylett's title, if any, were common infirmities affecting the common stem of the title and in no wise affecting the controversy between plaintiff and defendant. Nor does defendant bring himself within any exception to the doctrine of a common source of title. So that, whether that doctrine proceeds in the nature of estoppel or as a rule of mere convenience in trying title, it is applicable here. [Harrison Machine Works v. Bowers, 200 Mo. l. c. 234 et seq. and cases cited.]

Where there is a common source of title, agreed to, assumed or shown to exist, the rule that plaintiff, in ejectment must recover on the strength of his own and not on the weakness of defendant's title, as to infirmities existing in title anterior to its common source, is departed from.

The point is ruled against defendant.

II. This brings us to other questions: The trustee named in A was the "sheriff of Webster county, Missouri, party of the second part." The granting clause of A ran: "Unto the said party of the second part." The habendum clause ran: "To Have and to Hold the same with the appurtenances to the party of the second part, and to his successor or successors in trust, and to his or their grantees and assigns forever. In trust, however, for the following purposes:" (Here follows the declaration of trust.) After describing the principal note secured and five annual interest notes, the deed provides that if the principal and interest notes be paid when due and if the grantor, Lemphere, pay taxes to accrue and keep the premises clear of statutory liens until the secured indebtedness shall be paid, then the deed shall be void, etc. But if Lemphere refuse or fail to pay the debt or interest or any part

thereof when due or payable or discharge such statutory liens, the holder of the indebtedness may pay the same, and such sums with eight per cent interest shall be a charge upon the premises and secured by A. It provides further that on the happening of any of the failures or refusals narrated, the deed shall remain in force and "at the option of the holder" of said indebtedness, the whole of the indebtedness shall become due and payable forthwith. Then follows this clause: "And the said party of the second part, or in case of his absence, death, refusal to act, or disability in anywise, the then acting sheriff of Webster county, Missouri, at the request of the legal holder of said note or any of them, may proceed to sell the property hereinbefore described or, any part thereof at public vendue to the highest bidder," etc.

Conveyance B narrates, *inter alia*: "And, whereas, default was made in the payment of the said note, secured in said deed, by reason whereof, I, H. S. King, sheriff of Webster county, Mo. and trustee, at the request of the legal holder of said note did proceed to execute the powers to me given by said deed, and having previously given twenty days' notice of the sale hereafter mentioned," etc. Further along it narrates: "That, I, the undersigned trustee, and sheriff of Webster county, Missouri, in consideration of the premises and of the sum of four hundred dollars to me paid and credited on said note as above stated, and paying the expenses of said sale by the said E. R. Durham of the county of Jackson and State of Missouri, do hereby bargain, sell and convey unto the said E. R. Durham," etc.

The principal note secured by A fell due September 5, 1899. The foreclosure was on the 9th of May, 1905, and B was executed on that day. At the date of the execution of A, James Goss was sheriff of Webster county. At the foreclosure he was out of office and had not lived in the county since March 16, 1903. The

foreclosure was made because of default in the payment of the principal note. James Hailey was sheriff when the principal note became due and King was sheriff at the date of the foreclosure. Between Goss's term and Hailey's term, Ray held the office for a term, and between Hailey's term and King's term Julian held the office for a term.

On a record thus outlined more than one question is put to us. One is: Which of those sheriffs was clothed with power to make a sale under A? It seems defendant claimed below that (not King, but) Goss was the right party to act as trustee. *Contra,* plaintiff claimed below and claims here that King was the proper party. Another question is: Assuming the legal title passed by the sale and that the outstanding title, if any, is a mere equity of redemption, then is such equitable right of redemption, if existent, a defense in straight ejectment dealing only with the legal title?

We will consider the last question first. .

(a) If there was a defective foreclosure and a consequent right of redemption left, who had that right? Plainly Lemphere and not defendant, a stranger to Lemphere's title. But waiving that view, and conceding that a defendant in possession can show an outstanding title in another to defeat ejectment, he must at least show an outstanding *legal* title. Especially so in this case because his answer (barring an admission of possession) was a general denial with no equitable defense pleaded. That in straight ejectment, with no equitable defense interposed, a defendant in possession cannot defeat recovery because of a right to redeem from a defective and irregular foreclosure of a deed of trust, is steadily held by this court. [Biffle v. Pullam, 125 Mo. 108, and cases cited; Kennedy v. Siemers, 120 Mo. 73; Springfield Co. v. Donovan, 120 Mo. 423; Lanier v. McIntosh, 117 Mo. 508; Schanewerk v. Hoberecht, 117 Mo. 22; Cobe v. Lovan, 193 Mo. 235; Adams v. Carpenter, 187 Mo. l. c. 634-5.]

In the Lanier case it was held: "A mere right of redemption in a third person, after foreclosure, is not such an outstanding title as will defeat a recovery in ejectment. The title 'must be such a one as the owner of the title himself could recover on if he were asserting it in an action. It must be a present, subsisting and operative title.' "

The cases last cited proceed on the theory that the legal title is in the trustee of a deed of trust and is conveyed by an irregular and defective foreclosure subject to the right of redemption. The Schanewerk case, we think, must be read in connection with Benton Land Co. v. Zeitler, 182 Mo. 251, which somewhat limits its application, but in no particular pertinent here. Deed of trust A conveyed the property to "the sheriff of Webster county." The name of no individual is mentioned. Now, "the sheriff of Webster county," in the person of King, executed the trust and conveyed at least the legal title by B to Durham. The narrations of the trustee's deed were true, prima facie. Any defect or irregularity in the foreclosure arises *dehors* these two deeds and the record of them, and rests in matter *in pais*. The defects and irregularities considered in the Schanewerk case and those following it, which did not prevent the vesting of the legal title in purchasers at foreclosures, were as vital and far-reaching as those (if any) in the sale in hand. It would seem, therefore, that the doctrine of those cases controls this one, viz.: That whatever the outstanding title, it is not a legal one but an equitable right of redemption, hence is no bar to recovery in ejectment where no equitable defense is interposed.

We might stop at this point and treat the case as determined, but there is another question urgently crying for settlement.

(b)  That question is: Were there any irregularities in the sale in respect to the execution of the power vested in the sheriff by A? We think not. The ques-

tion hinges on getting at the meaning of the language used and thereby uncovering the intention of the parties to the contract, the deed of trust. [Linville v. Greer, 165 Mo. 380; Wolfe v. Dyer, 95 Mo. 545; Utter v. Sidman, 170 Mo. 284; Hanna v. Land Co., 126 Mo. 1; Knapp v. Publishers, 127 Mo. 53; Buxton v. Kroeger, 219 Mo. 224.]

To ascertain the intention of the parties to a deed or other contract the instrument must be viewed as a whole from end to end and corner to corner and interpreted in the light of the circumstances surrounding the parties, the object to be subserved, and with common sense. Attending to that instrument we see that Lemphere was giving security for a note due Hayes. For the purpose of that security a trust was created and the legal title was vested in the trustee, not out-and-out for *all* purposes, but merely for the purpose of executing the trust. [Benton Land Co. v. Zeitler. *supra.*] The trust created and power donated are limited by the fact that the trustee may never be called upon to act. His bare legal title is so modified by the purposes of the trust that the trust may terminate or fall in if the debt is paid. The dominant idea that the whole instrument is but a security for the debt must be kept steadily in view, and not only does the trust end and the legal title revest on the payment of the debt but the trustee in the deed of trust cannot convey his bare legal title by deed disconnected from executing the power donated. Not only so, but a succession of trustees is carefully provided. In certain named contingencies the original trustee becomes *functus officio* and his named successor is to execute the power. Now in this trust deed there is no hint that Lemphere and Hayes were contracting that Goss, then sheriff, alone held a donation of power to execute the trust. To the contrary, the parties industriously and of set purpose provided for a line of succession to make the security effectual and easily accomplished by avoiding

complications or accidents in the way of foreclosure.
The foreclosure being of the very life of the contract,
in very reason the language used must be construed
with reference to that capital event. Under the con-
tract terms, the *time* of foreclosure was held potenti-
ally in the grasp of the owner of the indebtedness. The
trustee could not legally move without his request.
When the owner was ready to make the request and to'
set on foot a foreclosure, what was he to do? Obvious-
ly, he would look about him to find the proper person
to request. The whole instrument led up to the one
crucial time and event. In casting about to discover
the trustee, the owner found Goss absent from the
county and King to be the sheriff of Webster county.
He was the "then" sheriff. The deed means that the
*then* sheriff had power to act, and "then" refers to
the time a foreclosure was demanded by the holder of
the indebtedness. We cannot well construe the in-
strument to mean that Goss, sheriff at the date of its
execution but absent from the county and residing
elsewhere at the date of the foreclosure, was the only
person to act in foreclosing. And there is nothing in
the instrument, as we see it, indicating that we must
look around for the date of *default* in the payment of
the secured note and search out who was sheriff at
that particular time. Why do that? The time of de-
fault might hinge on the non-payment of an interest
note or the happening of some other contingency men-
tioned in the deed. By an extension agreement, the
date of default might be altered. So default might
spring from the non-payment of taxes, etc. So there
might be more defaults than one, happening at differ-
ent times, and some of them might be waived. Again,
the paper may have changed hands and information
as to these defaults may not be in possession of the
present holder. Keeping in mind these usual incidents
in the life of a deed of trust securing one or more notes,
what sensible present purpose within the intent of the

parties to the contract could be subserved by construing the phrase, "the then acting sheriff of Webster county, Missouri," to mean the sheriff in office when the deed was executed or the sheriff in office on the springing of one or another default? Why say the mere time of default was of significance when the time of foreclosure obtrudes itself as the chief thing? Such construction of the contract would inevitably lead parties and courts afield to flounder in bogs of practical difficulties and uncertainties in construction, with no visible corresponding benefit attained, and no sensible purpose of law subserved.

Furthermore, it is believed that the custom has long been to select as the sheriff, clothed with authority under deeds of trust, couched in the terms of this, the one in office at the date of the foreclosure in the contingency of absence, death, refusal to act, etc. That is the simple plan, free from trouble and doubt, easy of determination and evidently the plan within the contemplation of the contracting parties as set forth in their language.

An analysis of the terms of the trust deed held in judgment in McNutt v. Life Ins. Co., 181 Mo. 94, shows that the contract language construed differs in (possibly) material features from that under consideration here. But the McNutt case apparently runs somewhat counter to the views entertained by us and herein expressed. That case was in Division Two. For the purpose, then, of preventing confusion in rules of law affecting real estate and tending to unsettle land titles in Missouri, and to procure a single, certain, clear and authoritative utterance of the whole court on the question, this case should be transferred to Banc to be ruled by all the brethren. We accordingly reverse the judgment and remand the case with directions to enter judgment for plaintiff for possession and rents at $2 per month from date of ouster.

Going into Banc and being reheard there, the fore-

going Divisional opinion of LAMM, J., is adopted as the unanimous opinion of the Court in Banc. The judgment is accordingly reversed and remanded with directions given in that opinion.