SALMONS' ADM'RS, Respondents, v. DAVIS *et al.*, Appellants.

1. One S. died in Kentucky in 1826. No administration in form was had upon
his estate, but his widow and heirs made a division of his property, and a
certain female slave named Milly was, with other property, assigned to the
widow. About ten years after the death of her said husband the widow

removed to the state of Missouri, bringing with her said slave Milly and her children. She died in 1855, and by her will disposed of said Milly and her children. Letters of administration were afterwards taken out upon the estate of S. *Held,* that the administrators of S. were proper parties plaintiff in a suit brought for the possession of said slaves in behalf of the representatives of said S.

2. The possession of a tenant for life is not adverse to the reversioner or remainderman; and he can not, by his acts and declarations, make his possession adverse so as to enable him to invoke the statute of limitations.

3. A husband dying, his widow and heirs made a division of his estate, includ ing slaves, among them. The widow afterwards dying, the administrators of the husband instituted suit against persons claiming under the widow for the possession of certain slaves that had been assigned to the widow. *Held,* that a bond executed by the heirs at the time of the division and by which they bound themselves to abide by the division, but which was not signed by the widow, though read over to her and not objected to, was admissible in evidence as part of the *res gestæ,* in behalf of the administrators, to show that the assignment was made to the widow as dower and not absolutely.

4. Declarations of a person in possession of personal property as dowress for life only, can not be received in evidence to elevate her estate into an absolute one.

### *Appeal from Pike Circuit Court.*

The facts sufficiently appear in the opinion of the court.

*Broadhead* and *Wells,* for appellants.

I. By the law of Kentucky at the death of Salmons, slaves descended to the heirs, as real estate. The title, therefore, vested in the heirs, and the administrators could acquire no title. The county court of Lincoln county had no authority to grant letters on the estate of Salmons, he never having resided or owned any property in this state. The court admitted illegal evidence, to-wit, the declarations of J. K. Salmons and others, heirs of Joel Salmons, contained in the deposition of Williams. The bond of the heirs was not admissible in evidence. It was not executed by the widow. It did not bind the widow and was never intended to do so. The declarations made by Mrs. Salmons as to her absolute title to Milly were improperly excluded. These declarations were competent to show the nature of her possession. The error of the court was in assuming that it was proven that

Eve Salmons took a life estate only. The court erred in refusing the instructions asked.

*Henderson* and *W. Porter*, for respondents.

I. The articles of agreement were properly admitted in evidence. The declarations of the widow were properly excluded. (21 Mo. 522; 24 Mo. 221; 27 Mo. 220.) The statute of limitations is not applicable to the present case. (Angell on Lim. 181; 5 B. & Ald. 204; 12 Wheat. 129; 2 Mart. 422.) The statute can not run against an administrator until the grant of letters. (19 Mo. 467; 26 Mo. 291.) The court properly excluded the declarations of some of the heirs of Joel Salmons; so the declarations of Nathan Salmons, one of the administrators. The court properly refused the instructions asked. The suit was properly brought in the name of the administrators. (1 Marsh. 14; 1 Monr. 255; 6 Monr. 139; 1 J. J. Marsh. 16; 2 Bibb, 188; 2 J. J. Marsh. 203; 1 Kentucky Stat. p. 666, § 41.) It was no case for the application of the statute of limitations. There was no cause of action until the death of Mrs. Salmons. (Angell on Lim. 185; 5 B. & Ald. 204; 23 Mo. 344; 12 Wheat. 129.) The slaves were received as dower. Mrs. Salmons had only a life estate. The instructions given were correct. (21 Pick. 88, 80; 4 Ala. 166; 24 Mo. 399; 1 Dana, 340; Story, Confl. 429, 439; 9 Wheat. 571; 5 Pet. 518; 20 Johns. 265; 1 Mo. 726; 1 Williams on Executors, 267; 14 Peters, 32; 2 Phill. Ev. 550; 8 Wheat. 671; see 2 Mo. 48; 1 Harr. 337; 2 Bibb, 89; 1 A. K. Marsh. 10; 3 Litt. 180; 5 Cranch, 358; 27 Mo. 421.)

NAPTON, Judge, delivered the opinion of the court.

One of the principal questions in this case is whether the administrator of Joel Salmons or his distributees should have brought this action.

Salmons died in Kentucky in 1826. No administration in form was had upon his estate, but his widow and children (who were all of age but one) divided out his property, and

the mother of the slaves now sued for, with other property, was assigned to the widow as her share of the estate. The theory of the action is that the slave was received as dower. However that may have been, the widow brought the slave Milly and her children from Kentucky about ten years after the death of her husband, and died here, shortly before this suit was instituted, in possession of the slaves. She undertook to dispose of them by a will, and her executors are accordingly the defendants in this suit, maintaining that the title of Mrs. Salmons to the slave Milly was absolute; and the plaintiff, representing the interests of the personal distributees of Joel Salmons, maintaining that the title of Mrs. Salmons was only for life, and that on her death the slaves vested in him as administrator of Joel Salmons. The question is, taking the plaintiff's view of the facts to be true, can the administrator, under the circumstances, maintain the action, or must the heirs of Joel Salmons bring the action in their name? The question only affects the form of the proceeding, for if the plaintiff prevails as administrator, he will recover merely as a trustee for the distributees.

It is well settled both in Kentucky and Virginia, where the law declares slaves to be real estate for some purposes, that they do not, in cases of intestacy, descend like land directly to the heirs, but go to the administrator as assets. Without the assent of the administrator, the title of the heir is not complete, and he can not maintain an action for them against a third person. After the passage of the act of 1800 in Kentucky, (2 Littell, 374,) slaves devised were no longer considered assets in the hands of the executors, but were held to pass, like land, directly to the devisee. But where there was no will, notwithstanding the statute declared them to be real estate, slaves, just as other personal property, passed upon the death of their owner into the hands of his administrator, and he alone could sue for them. (Woodyard's heirs v. Threlkeld, 1 A. K. Marsh. 14; Irons v. Luckey, ib. 54.)

There is no doubt, therefore, that the administrator is the

proper person to sue for slaves belonging to the estate of his decedent in ordinary cases, and where the property has never been administered on and handed over to the persons entitled to it after the payment of all claims against the estate.

Where there is a particular estate in a chattel and a remainder over, a delivery to the owner of the particular estate may be considered as a delivery to the person who has the remainder. Upon the death of the tenant for life in such cases, the title to the property is vested in the person having the remainder, and he alone is the proper person to bring an action for its recovery. As where a person dies, leaving slaves to A. for life, with remainder to B. absolutely; upon the death of A., to whom the executor or administrator of the devisor has delivered them, B. may maintain his action. The property has passed from the estate, and the administrator has nothing more to do with it.

But where a life estate is created by will or by law, and no remainder is designated, the reversion, as the remainder is then called, falls back into the assets of the original estate, and the administrator, in such cases, is the proper person to sue. Such may be regarded as the character of the present case, where slaves have been assigned as dower, which is a life interest only, and the reversion on the death of the dowress is in the estate of the husband. The administrator of that estate, and not the heirs or distributees, may well sue, considering the property as falling back into the mass of assets. This course will not only be more convenient, but in some cases it may be important to the rights of the distributees, who may have been unequally advanced in former distributions, and who may, through the intervention of this administration, have these inequalities corrected. Whether, under the circumstances of the present case, such as the death of Salmons' intestate more than thirty years ago in Kentucky, and the acquiescence of all parties in the possession of the negroes in controversy by Mrs. Salmons as dower, the consent of the administrator of Salmons might not be presumed, and an action be maintained by the heirs, is not

the question here. The question is, not whether the heirs might not under certain circumstances sue, but whether in this case the administrator could; and our opinion is, that, under the circumstances of this case, the suit was properly brought by the administrator.

The statute of limitations appears to have no bearing on this case, although some instructions were asked, and some evidence was offered, having reference to a title under this statute. A person having a life estate in property can not, by his acts or declarations, set up pretensions to an absolute estate, so as to make his possession an adverse one to the reversioner or remainderman. The reason of this is that there is no right of action in the reversioner until the particular estate has determined, and the possession of the tenant is entirely consistent with the title of the reversioner. In fact the latter concedes the existence of the former, and whatever the tenant for life may do or say about his title can be of no consequence to the reversioner; for, whether true or false, the latter can not disturb the life tenant during the admitted duration of his tenancy. It is impossible, therefore, for the tenant for life to make his possession an adverse one to the claim of one who has the remainder or reversion. It is not like the case of a trustee and a *cestui que trust*. The trustee may disclaim his trust and hold adversely to his *cestui que trust* as well as all others. The *cestui que trust*, unless laboring under some of the disabilities recognized by the statute and provided for, may sue the trustee at any time; and therefore if an adverse possession continues long enough, it will protect the trustee, notwithstanding the general principle of equity law that no length of time will bar a trust. This general maxim is applicable only to cases where the relation of trustee and *cestui que trust* continue and is recognized; for when the trustee disavows his trust openly, and maintains a position adverse to his *cestui que trust*, as he may do, he has the same benefit from the statute of limitations which all others have. But the case of tenancy for life is different. There is no one to sue, no matter how

often or how openly and loudly such tenant may claim to be absolute proprietor; for the person in remainder or reversion concedes the right of possession for life and can not therefore disturb it. The case, therefore, did not require any instructions based upon the statute of limitations.

If Mrs. Salmons took the slaves as her dower or as tenant for life, her possession could not be made adverse to the persons in remainder or reversion; and if Mrs. Salmons, as was contended on the part of the defendant, took an absolute estate, then the statute of limitations was out of the question.

The question of fact, upon which this case turned and upon which instructions from the court were given, was whether Mrs. Salmons took the slave Milly, the ancestress of the slaves sued for, as her dower and as a tenant for life, or whether, by virtue of the arrangement which took place between her and the heirs after the death of her husband, she acquired an absolute title to them. It appears that shortly after the death of Joel Salmons, his children paid off the debts of the estate, and having selected persons to appraise the property, divided it among themselves, after assigning to the widow the slave Milly and some other property. It is immaterial whether this division was binding upon the heirs or not; it was satisfactory to them and was satisfactory to the widow. It was made more than thirty years before this suit was brought, and has been acquiesced in ever since. The paper which preserved the evidence of this division was signed by all the children and was in the form of a penal bond with conditions. It was not signed by the widow, but was read over to her and was not objected to. This paper was given in evidence on the trial notwithstanding the objections of the defendants. We think the paper was admissible as a part of the *res gestæ*. It was contemporaneous with and explanatory of the whole transaction.

It will be observed that by the law of Kentucky, as it was at the time of this transaction, a widow's dower in the slaves of her husband could not under any circumstances by the

mere force of the law exceed a life estate. (1 Litt. Ch. 293.) There was no provision, as there is in our state, for her taking any proportion of the slaves absolutely. We do not say, that, by consent of the heirs, such an interest could not be yielded to the widow; but the legal presumption, in the absence of any agreement, would be, that slaves taken as dower would be taken only for life. The instruction, therefore, which the court gave the jury on this point, was certainly quite as favorable to the defendants as the law would permit. The court did not give to the plaintiff the benefit of a presump tion which the law gave them in the absence of any agreement to the contrary.

Upon another point, also, the instructions of the court were more favorable to the defendants than the law warranted. By the laws of Kentucky, in 1826, a nuncupative will of slaves was not allowed. Such at least is the construction of the act of 1800, which directed slaves to pass by will as land, given by the courts of that state. (McCans & wife v. Board's heirs, 1 Dana, 341.)

The exclusion of the declaration of Mrs. Salmons, tending to show her claim of an absolute title in the slaves, was proper: (Watson v. Bissell, 27 Mo. 223.)

The declarations or statements of Robert Salmons, John K. Salmons, and E. Chasten, distributees of Joel Salmons, deceased, were properly excluded. These persons were not parties, and were competent witnesses. Some of them did testify in the case, but no foundation was laid for contradicting their evidence, or impeaching their veracity, by declarations inconsistent with their statements in court.

The declaration of Nathan Salmons, the administrator, was also properly excluded, because it was made long before he was administrator; and as to matters which occurred previous to his taking out letters, he was fully competent to testify, although a party to the suit.

In relation to portions of the deposition of N. N. Williams, admitted on behalf of plaintiffs, which are objected to as

hearsay and incompetent, it is sufficient to say that no excep-tion was taken to those depositions at the trial.

Judge Ewing concurring, judgment is affirmed. Judge Scott absent.