HORACE CRISMOND and IVY M. SPRATT v. BIRDIE KENDRICK ET AL.; COMMERCE TRUST COMPANY, B. C. HOWARD and PHOENIX MUTUAL LIFE INSURANCE COMPANY, Appellants.—29 S. W. (2d) 1100.

Division Two, June 11, 1930.

620

*Samuel D. Newkirk, Robert E. Coleberd* and *Sam Withers* for appellants; *Meservey, Michaels, Blackmar, Newkirk & Eager* of counsel.

622

*John S. Crawford* and *Smith B. Atwood* for respondents Horace Crismond and Ivy M. Spratt.

624

*S. J. Jones* and *John D. Taylor* for other respondents.

COOLEY, C.—This is an appeal from an interlocutory judgment and order of sale in partition. The action was brought in the Circuit Court of Carroll County for the partition of one hundred and sixty acres of land, and to determine the rights and interest of appellants under deeds of trust purporting to convey the lands to defendant Howard as trustee for the two corporation defendants. Plaintiffs and the defendants, other than appellants, are the eight surviving children of Sarah L. Crismond and six of her grandchildren, the latter being the children of a deceased son. Sarah L. Crismond died in June, 1926, and at her death the foregoing constituted all of her bodily heirs. They are all respondents herein. Appellants Commerce Trust Company and Phoenix Mutual Life Insurance Company are the owners of notes given by Sarah L. Crismond and secured by two deeds of trust given by her April 25, 1925, purporting to convey full title to the lands in suit. Appellant Howard is trustee in the deeds of trust, having no other interest. Both deeds of trust were given to secure a loan made by Commerce Trust Company to Sarah L. Crismond, the first securing the principal loan of $6500, which has been assigned to and is now held by the Phoenix Company, and the second securing a commission note of $325 still owned by Commerce Trust Company.

Respondents claim that Sarah L. Crismond owned only a life estate in the lands and that her said deeds of trust therefore conveyed only such interest, leaving respondents at her death the owners of the land in fee free from any claim or lien of appellants. Appellants do not contend that Mrs. Crismond had good record title, but they claim she had acquired and owned the fee simple title by adverse possession, invoking the ten and twenty-four years' statutes of limitation, in which case their deeds of trust would be liens on the land superior to respondents' interests; and further, they plead that respondents knew that Mrs. Crismond was claiming the land in fee, that she was procuring the loan in question upon the representation that she was such owner, and that they not only acquiesced but aided and assisted her in procuring the loan and are estopped as against appellants from disputing this claim.

The case was tried by all parties as one in equity. The trial court found and decreed that Mrs. Crismond owned only a life estate, and that the respondents are the owners of the lands in fee free from any claim or lien in favor of appellants, except the interest of respondent Horace Crismond, as to whom the court adjudged that he was estopped by his acts and conduct and that his interest was subject to the deeds of trust. Partition was adjudged accordingly. An allowance of $200 was made to respondent Paul Crismond, son of Sarah L., for the value of improvements placed on the premises by him under contract with his mother by which such improvements were to belong to him. From this judgment

defendants Commerce Trust Company, Phoenix Mutual Life Insurance Company and B. C. Howard appealed. Horace Crismond did not appeal.

The land in controversy consists of two eighty-acre tracts, viz., the south half of the southeast quarter of section 22, and the south half of the northwest quarter of section 26, all in Township 55, Range 22, in Carroll County. The first named tract is frequently referred to. in the record as the north tract or eighty, and the second as the south tract or eighty, and for convenience we may so designate them. Title to both tracts emanated from the United States Government in 1819. Respondents introduced such record title as there is from the patentees to the time of the deeds to Sarah L. Crismond in 1860, but there are breaks in the record chain of title, and since it is asserted by appellants and tacitly, at least, conceded by respondents that good record title was not shown in the persons who conveyed to Mrs. Crismond, and they were not shown to have been in actual possession, we deem it unnecessary to set out the various conveyances.

In 1856, one Juliza A. Garnett received and placed of record deeds purporting to convey to her both tracts, and by deeds dated November 8, 1856, recorded March 9, 1857, she conveyed the north tract to Mark Bowling, and the east half of the south tract, that is, the southeast fourth of the northwest quarter of section 26, to Elizabeth Bowling. Mark and Elizabeth Bowling were husband and wife.

In appellants' motion for new trial they allege error on the part of the court in admitting "deed dated Nov. 8, 1856, recorded in Book L, at page 406, from Juliza A. Garnett to Mark Bowling purporting to convey the southwest quarter of the northwest quarter of section 26, Township 55, Range 22," indicating that there was such deed made and recorded at the same time as the other two from Juliza A. Garnett (which appear of record in Book L, page 405) and that it was offered in evidence, but we do not find in the abstract of the evidence a showing of the introduction of such deed. It is not shown that the Bowlings or any one prior to them were ever in actual possession of the land.

The Bowlings, by three separate deeds, conveyed all of both tracts to Sarah L. Crismond or to her and her bodily heirs. All three deeds are dated and acknowledged May 10, 1860, and recorded May 15, 1860, the acknowledgments being taken and certified by the same officer. As these deeds present controverted questions we set out two of them, the third being similar to the second. They constitute respondents' exhibits 1, 3 and 4. Exhibit 1, omitting the acknowledgment, about which there is no controversy, is as follows:

"This Quit Claim deed made and entered into this Tenth day of May Eighteen Hundred and Sixty, between Mark Bowling and

Elizabeth Bowling, of the first part, and Sarah L. Crismond of the second part, all of the County of Carroll and State of Missouri. Witnesseth, that the party of the first part, for and in consideration of one hundred dollars to them in hand paid by the said party of the second part, the receipt of which is hereby acknowledged, have granted, bargained, sold and conveyed and quitclaimed and by these presents do grant, bargain, sell and quitclaim unto the said party of the second part, the heirs of her body, executors, administrators and assigns, all their right and title, interest, claim and estate, both at law and in equity, and as well in possession of, in and to all that tract or parcel of land being: The South half of the Southeast Quarter of Section Twenty-two, Township Fifty-five of Range Twenty-two, containing Eighty acres (ten acres of which the said party of the first part have prior to this granted, bargained and sold unto Gordon Jefferies) to have and to hold, free from the claims of the party of the first part, their heirs and assigns and that only.

"Witness our hands and seals this the day above written.

"MARK BOWLING (Seal)

her

"ELIZABETH X BOWLING (Seal)"

mark

Exhibit 3 with its acknowledgment is as follows:

"This indenture made and entered into this tenth day of May A. D. Eighteen Hundred and Sixty, between Elizabeth Bowling and Mark Bowling of the first part, and Sarah L. Crismond of the second part, all of the County of Carroll and State of Missouri, witnesseth, that the said party of the first part, for and in consideration of the sum of five hundred dollars to them in hand paid, the receipt whereof is hereby acknowledged do hereby grant, bargain, sell and convey unto the said party of the second part the following described tract or parcel of land together with all and singular the rights and appurtenances thereunto belonging, lying and being in the County of Carroll and State of Missouri, to-wit: The Southeast Quarter of the Northwest Quarter of Section Twenty-six of Township fifty-five North, in Range twenty-two West, containing Forty acres, more or less, to have and to hold the same to her, the said party of the second part, the heirs of her body, and assigns forever, and the said party of the first part for themselves, their heirs and covenants to and with the said party of the second part, the heirs of her body and assigns against themselves, their heirs and all persons and claims whatsoever.

"In Testimony Whereof, we have hereunto set our hands and seals the day and year first above written.

her

"ELIZABETH X BOWLING (Seal)

mark

"MARK BOWLING (Seal)

"State of Missouri, County of Carroll.

"Be it remembered that Mark Bowling and Elizabeth Bowling, his wife, who are personally known to the undersigned, a Justice of the Peace within and for said County, to be the persons whose names are subscribed to the within or foregoing deed as parties thereto, this day appeared before me and acknowledged that they executed and delivered the same as their voluntary act and deed for the uses and purposes therein contained. And the said Elizabeth Bowling being by me made acquainted with the contents of said deed, acknowledged on an examination apart from her said husband, that she executed the same and relinquished her dower in the real estate therein mentioned, freely and without compulsion or undue influence of her said husband.

"Given under my hand this 10th day of May, A. D. 1860.

"JAMES RIPPETOE,

"Justice of the Peace.

"Filed for record May 15th, 1860."

Exhibit 4 is identical in form with exhibit 3 except it names "Mark Bowling and Elizabeth Bowling" as of the first part, recites a consideration of $600 instead of $500, and the land conveyed is the southwest quarter of the northwest quarter of said section 26.

Mrs. Crismond was about eighty-four years old when she died, which would make her about eighteen when the above mentioned deeds were made. She was then married to Mr. Crismond, but the date of their marriage is not shown. There is evidence that Mr. Crismond had been married previously and had children by the former marriage living at the time of the said conveyances. There was also evidence, which will be more fully stated later, from which it may be inferred that Mrs. Crismond and her husband moved upon the land in question as early as 1865 and that she and her family thereafter resided thereon continuously until her death, she paying the taxes and being in possession. Her husband died about 1906, and after his death she remained a widow, one son, Horace, living with her on the south eighty, and the north eighty being farmed by her son Paul as her tenant. There is no evidence that any former owner or person who might claim to be such owner or to have rights derived from a former owner ever set up any claim or made any conveyance purporting to affect the title to any of this land after the deeds from the Bowlings above mentioned were made. Other facts will be given in connection with the points to be discussed to which they may be pertinent.

I. Appellants contend that there is neither presumption nor proof that Sarah L. Crismond entered into possession under the Bowling deeds and that her possession is not based upon or referable to those deeds. In this appellants are mistaken. She must have taken and held possession under some claim of title or right in order for her possession to be adverse and to ripen into title. [Missouri Lumber & Mining Co. v. Chronister (Mo.), 259 S. W. 1042; Feller v. Lee, 225 Mo. 319, 124 S. W. 1129.] She states in her application to appellants for the loan, which application appellants introduced in evidence, that the land was purchased in 1859 and that she paid for it and had lived on it for sixty years. True, she said it was purchased in 1859, while the deeds indicate the purchase was in 1860. But we cannot agree with appellants that that statement of the time indicates a purchase in 1859 from some one other than the Bowlings. It was merely an error of memory. In the same application she said she could not remember the amount paid. There is not a scintilla of evidence of a purchase from any one but the Bowlings, nor any conveyances to her from any one else. She did have conveyances from the Bowlings and the deeds recite considerations aggregating $1200.

In Feller v. Lee, supra, it is said that the law presumes every possession is consistent with some title. She had color of title at least and doubtless, judging from the price paid, what she believed was real title, from the Bowlings, and no color or semblance of title from any other source.

"Every possession is presumed to be under such title as the party in possession holds, and from the time such title is acquired." [Hawkins v. Cedar Works, 122 N. C. 87; Clendenin v. Clendenin, 181 N. C. 465.]

In conversations with two of her sons years later (which will be stated in considering another point) she mentioned the reason why the Bowling deeds were made to her and her bodily heirs, indicating that she was holding under those deeds. She knew, of course, that except for the Bowling deeds she had no title and no right to take possession. There was evidence that it was generally understood in the family that the land had been acquired from the Bowlings. There can be no doubt that she took and held possession under the Bowling deeds.

II. It is claimed that the quitclaim deed from Mark Bowling and wife purporting to convey the north eighty, Exhibit 1, supra, is void because the description is insufficient; this because after describing and conveying the whole eighty the grantor says, parenthetically "(ten acres of which the said party of the first part have prior to this granted bargained and sold unto Gordon Jeffries)." No conveyance by Bowling to

Gordon Jeffries is shown and the ten acres said to have been sold to him is not described in Bowling's deed to Mrs. Crismond. But it will be noticed that he does not say in the deed that said ten acres is *excepted* from the conveyance. The deed, we think, is sufficient to convey and was intended to convey whatever interest Bowling had in the whole eighty. Under it Mrs. Crismond took and held possession of the whole tract and whatever title, if any, Jeffries had was never asserted by him and was lost long ago by reason of the Statute of Limitations.

In Mathews v. O'Donnell, 289 Mo. l. c. 263, 233 S. W. 451, a similar contention was made. This court, while holding the description sufficient by reason of reference to another deed, said:

"The grantee took and retained exclusive possession of the tract conveyed. This of itself would cure the defective description. The defendants derive title through the conveyance. It passed the interests of the grantors. [18 C. J. 292, sec. 268.]"

In any event, since Mrs. Crismond took and held possession under the deed, the defect in the description if it be such, cannot aid appellants' case.

III. Another point made by appellants, somewhat akin to the foregoing, is that the acknowledgment of Elizabeth Bowling to her deed, Exhibit 3, supra, is insufficient for that the certificate of acknowledgment merely recites that she relinquished her dower. It does more. It recites, among other things, as required by the statute then in force, that "the said Elizabeth Bowling being by me made acquainted with the contents of said deed, acknowledged on an examination apart from her said husband, that she *executed the same* and relinquised her dower," etc. (Italics ours.)

In Hendricks v. Musgrove, 183 Mo. 300, 308, 81 S. W. 1265, cited by appellants, the acknowledgment is not set out. The court says that the deed "purported to be the deed of John J. Hendricks and his wife, Mary F. Hendricks, and it was acknowledged by Mrs. Hendricks only as wife, she relinquishing her dower in the land, and not by her as the owner of the land." It was therefore held ineffectual to convey the interest of Mrs. Hendricks.

In the other cases cited by appellants the certificate of acknowledgment was held insufficient because not showing that the wife was made acquainted with the contents of the deed and acknowledged, etc., on examination apart from her husband. They are not in point.

In an early case, Chauvin v. Wagner, 18 Mo. 531, 546, the certificate of acknowledgment of a married woman was in substantially the same form as in this case, so far as concerns the point raised by appellants, and it was held that the added words, "and re-

linquished her dower" were merely superfluous and did not vitiate the certificate. That case was thereafter followed, and in Miller v. Powell, 53 Mo. 252, it was said that the doctrine so announced in Chauvin v. Wagner, supra, "must be considered settled as a rule of property in this State."

In Barker v. Circle, 60 Mo. 258, 262, the certificate of acknowledgment of a married woman to an instrument conveying lands owned by her along with land of her husband was in the same form as in this case and made under the statute of 1855, as here. The certificate was held sufficient, the clause relinquishing dower being treated as surplusage as to the lands owned by the wife. See also Backman v. Ennis Real Est. & Inv. Co., 204 S. W. 1115, where cases are reviewed and, Hendricks v. Musgrove, supra, distinguished; Hauser v. Murray, 256 Mo. 58, 165 S. W. 376; Siemers v. Kleeburg, 56 Mo. 196; Mathews v. O'Donnell, supra; R. S. 1855, Secs. 32, 39, pp. 362, 363.

Elizabeth Bowling is named first as grantor in the deed and both she and her husband acknowledged its execution and delivery to be their voluntary act and deed. The only objection made as to the sufficiency of the certificate of acknowledgment is that the words "and relinquished her dower in the real estate therein mentioned" are added. These words may be treated as surplusage. The acknowledgment is sufficient.

IV. It is contended by appellants that the Bowling deeds purport to convey to Sarah L. Crismond a fee simple title. In support of this contention they cite several cases, relying chiefly upon Tennison v. Walker (Mo.), 190 S. W. 9. In the deed there under consideration, Narcissus Tennison is named as party of the second part and the deed recites a consideration of $400 paid by her and then purports to grant "unto the said party of the second part and her bodily heirs and assigns" the land conveyed. In all other parts of the deed, including the *habendum* and warranty clauses, the reference is to said party of the second part, her heirs and assigns. The court in discussing the case says that the deed uses the words "her bodily heirs" but once, coupled with the words "and her assigns" in the granting clause, "while it uses the words 'party of the second part' or '*the party of the second part and her heirs and assigns forever*' five times . . ." It is held that the deed upon its face is ambiguous and uncertain. Some significance is attached to the use of the word "assigns" following "her bodily heirs" in the granting clause as tending to throw doubt on the meaning of the words "her bodily heirs," which the court says should be considered along with the other clauses of the deed in ascertaining the intention of the grantor. Certain erasures and interlineations in the deed are considered

as tending to show the intent of the parties. Much stress is laid upon the significance and effect of the *habendum* clause as explaining, qualifying and defining the estate granted. The opinion cites and quotes from a number of cases to the effect that while the *habendum* clause in a deed cannot be used to defeat a grant it may be used to explain or qualify it and to define the estate granted if it has not already been defined, and that "it will even control or modify the granting clause when by such control or modification the intent of the grantor as expressed in his words is made plain and effectuated." [Garrett v. Wiltse, 252 Mo. 699, 161 S. W. 694.]

While in the Tennison case the court reaches the conclusion that, in view of all of the provisions of the deed and the construction which the court finds the parties thereto placed upon it, that deed was intended to convey the fee simple title to Narcissus Tennison, it also approves and quotes extensively from Utter v. Sidman, 170 Mo. 284, 70 S. W. 702. In the latter case the deed in question recites a consideration of $3,000, paid by Frances A. Clark, and names said Frances A. Clark in the granting clause as grantee. The *Habendum* clause is "unto the said Frances A. Clark and her bodily heirs and assigns, forever." The covenant of warranty is: "I, the said James A. McCullah, hereby covenanting to and with the said Frances A. Clark, *her heirs and assigns, for herself, her heirs, executors and administrators,* to warrant and defend the title of the premises hereby conveyed, against the claim of every person whatsoever." (Italics ours.) The court reviews many decisions of this and other states and holds that the deed in question gave Frances A. Clark only a life estate with remainder to her bodily heirs. In that case as in this it was argued that the use of the word "assigns" in the *habendum* and other clauses indicated an intention to pass to Frances A. Clark more than a life estate, but the court denied the contention. The deed in that case also showed a purchase by Frances A. Clark, not a gift to or settlement upon her.

In Kane v. Roath, 310 Mo. 684, 276 S. W. 39, decided by Division One of this court, which also decided the Tennison case, Utter v. Sidman, supra, is again approved, and the Tennison case and several others cited by appellants herein are distinguished. Numerous cases are reviewed. The deed construed in Kane v. Roath named Atilla Gudgell and her lawful heirs by Robert E. Gudgell, her husband, as "party of the second part;" the granting clause granted to "said party of the second part, her heirs and assigns;" *Habendum* to "Atilla Gudgell and her lawful heirs by said Robert Gudgell, her husband, to said party of the second part, to her heirs and assigns forever;" warranty to "said party of the second part her heirs and assigns forever." The deed was held to convey a life estate to Atilla Gudgell, with remainder to her bodily heirs by her hus-

band Robert Gudgell. The deed showed payment of the consideration by Atilla Gudgell, which it was argued indicated a purchase by her and tended to raise a presumption that the intent was to convey to her the fee without limitation. Answering that argument the court said:

"If Atilla Gudgell was a purchaser paying full consideration for the land, it might be presumed that the grantor would and did make the deed to such grantee or grantees, and on such conditions, as between the grantees, as were desired by the purchaser. If Atilla Gudgell was the purchaser, for value, and desired to take the sole and absolute title, we can see no reason why the particular words of limitation here found should have been used, and reiterated . . ."

See also Shaw v. Bank of Dearborn, 324 Mo. 348, 23 S. W. (2d) 20.

We have examined the other cases cited by appellants and find that none of them lends any greater support to appellants' contention than the Tennison case.

In the instant case the two warranty deeds named Sarah L. Crismond as party of the second part. The granting clause is to "said party of the second part." The Habendum is "to have and to hold to her, the said party of the second part, the heirs of her body, and assigns forever," and the covenant of warranty also is to "the said party of the second part, the heirs of her body and assigns." The quitclaim deed names Sarah L. Crismond as second party and the grant is "unto the said party of the second part, the heirs of her body, executors, administrators and assigns." No one is mentioned in the Habendum, the only language in the deed indicating to whom the grant is intended to be made being in the granting clause itself. The three deeds, as stated above, were all made at one time and obviously constituted a single transaction. Mark Bowling evidently did not wish to warrant the title to the eighty in section 22, but was willing to do so as to the forty in section 26. The title to the other forty in section 26 was in Elizabeth Bowling, hence, doubtless, the three deeds instead of one. In all three deeds care was taken to write in the words "the heirs of her body." There is nothing in the deeds to indicate that this was done inadvertently or through ignorance of the effect of those words.

At the time these Bowling deeds were executed, Mrs. Crismond and her husband gave a mortgage on these lands to her mother to secure some sort of bond for $1200, evidently the purchase money, as the amount is the aggregate consideration named in the Bowling deeds. Appellants argue that she was thereby claiming the fee, indicating that she understood that the deeds conveyed the fee to her. Such conclusion is negatived by her own subsequent statements.

Two of her sons, when being examined on the issue of adverse possession as to statements made by her while in possession of the land, testified that at different times she said that the deeds were made as they were because her mother furnished the money to buy the land and that her husband had been married before and had children in Virginia and the deeds "were fixed that way . . . so that her children could get this property; that is, the first children couldn't come in and get this property coming through her."

As to the use of the word "assigns" in the warranty deeds and "executors, administrators and assigns" in the quitclaim deed, following the words "the heirs of her body," we are not persuaded that such use evinces an intention to give Sarah L. Crismond more than a life estate or to destroy the limitation to her bodily heirs, evidently made intentionally. As these deeds are worded, such language in the warranty deeds may be considered as referring to assignees of the life estate or to the assigns of the bodily heirs in whom the fee was ultimately to vest, and in the quitclaim deed to the assigns of such bodily heirs, as easily as it could be referred to Sarah L. Crismond herself, thus giving effect to all the provisions of the deeds. There is no ambiguity in these deeds which requires special significance to be given to the use of the words above quoted.

In view of the decisions above mentioned, including Tennison v. Walker, supra, and the authorities cited in the cases mentioned, we are of the opinion that the Bowling deeds purported and were intended to convey what at common law would have been an estate tail, which under our statute would become an estate for life in Sarah L. Crismond, with remainder in fee to her bodily heirs. [See also Bank of Brumley v. Windes (Mo.), 282 S. W. 696; Chew v. Kellar, 171 Mo. 215, 225, 71 S. W. 172; Lott v. Braham, 92 W. Va. 317, 166 S. E. 513.]

V. If, as we have held, Mrs. Crismond entered into possession under the Bowling deeds and retained that possession claiming under such deeds until her possession ripened into title under the Statute of Limitations, what was the character of the title thus acquired? Was it a fee simple title in her, as claimed by appellants, or a life estate with remainder in fee to her children or her bodily heirs, as contended by respondents? That, it seems to us, is the anxious question in this case.

In seeking solution of this question it is well to determine first whether, prior to the time when her possession ripened into title, Mrs. Crismond ever claimed a greater interest than the Bowling deeds purported to give her, or asserted any claim that could be construed as adverse to the remaindermen. As stated above there is evidence from which it may be legitimately inferred that she

went into possession under the deeds, which constituted color of title, as early as 1865; this from her statements in the application for the loan in April, 1925, that she had purchased the land and had lived on it for sixty years. There is no evidence to the contrary. The statutory period of limitation, then as now, was ten years. There is nothing in the evidence to indicate that any grantee in any conveyance prior to the Bowlings whose interest did not pass by conveyance to the Bowlings under disability so as to prevent the running of the statute. Mrs. Crismond's possession therefore ripened into title as early as 1875. Now, down to that time and indeed until as late as 1887, there is no word or act of hers shown that possibly could be construed as a claim hostile or adverse to the remaindermen or as evincing an intended denial of the existence of an estate in remainder in her children, born or to be born, save only the giving of the mortgage above referred to at the time the Bowling deeds were made. At that time, considering her youth, it is probable she had but recently been married and had no children. The ages of most of her children are not shown, nor which was oldest. Of course the giving and placing of record of that instrument could not constitute notice to children then unborn of an adverse claim by her, and if she then had children they were necessarily very young. As evidence of a belief on her part that she owned the fee or an intention to assert claim thereto against her children, it is negatived by her subsequent statement, testified to by two of her sons, that her mother had furnished the money to buy the land and that the Bowling deeds were made to her and the heirs of her body in order to insure that her children should get the property. On cross-examination by appellants of one of the sons, Tillie Crismond, it was brought out that about 1897 his grandmother (Mrs. Crismond's mother) told him she had furnished the money to buy the land and "had fixed it so that my father's children, first children, couldn't come in," and that he asked his mother about it and she said it was so. Such statements, we think, show that Mrs. Crismond recognized the purpose and effect of the deeds and was claiming in accordance therewith, with no thought of claiming adversely to the children.

In Breidigam v. Hoffmaster, 61 Pa. 223, the owner of land died intestate. By his will the land in question passed to his widow, but it was contended by the defendants that she took only a life estate. Plaintiff in the suit, which was ejectment, claimed by purchase from the widow and that she had claimed and held the land adversely and thereby obtained title. It was shown that while in possession she had said that the land was hers and she could do with it as she pleased. There was also evidence that she had said that her husband had willed the land to her as long as she had his name, it then to go to the children they had held in baptism and

after their deaths to a certain church. It was held that the latter statement, if made, negatived "any adverse claim or intention to claim the property by the Statute of Limitations."

With the exception of the above mentioned mortgage and her actual possession and payment of taxes, the evidence of alleged acts or statements of Mrs. Crismond offered in support of appellants' claim that she acquired fee simple title by adverse possession related to a time long after the Statute of Limitations had fully run. It consisted mostly of a series of deeds of trust, beginning as to the south tract in 1887 and as to the north tract in 1909. There were in all some eighteen or twenty such instruments offered in evidence for varying amounts, a number of which from their dates and amounts appear to have been commission notes, others being renewals of former loans. It is apparent that the south tract, since 1887, and the north tract since 1909, were mortgaged to some extent continuously up to the time appellants' loan was made, the proceeds of that loan being used to pay off the then existing loans.

The oral evidence on that subject was in substance this: Horace Crismond, son of Sarah L., who had lived with her on the place and farmed part of it for her for many years and who had assisted in procuring the loan from appellants and had in writing guaranteed payment of the notes, testified that for the past thirty years or so his mother had "claimed to own the land." Asked to state what she had said in regard to that, he answered: ". . . just owned this like any one else would claim it, said it was her land." He was forty-eight years old at the time of the trial, making the date of his birth 1879. He testified he had never heard his mother speak of the land as being deeded to her and her bodily heirs.

Mrs. Spratt, a daughter of Sarah L. Crismond, born in 1885, testified that her mother "always spoke of it as being her land," and that the other children would refer to it as their mother's land.

Mr. Patton, the agent who negotiated the loan for appellants, testified that he lived at Bosworth and knew the land; was in the real estate business and had shown lands in the vicinity to prospective customers; that the "general reputation" in that vicinity was that Mrs. Crismond owned the land; that people would speak of it as Mrs. Crismond's; that some might just have spoken of it as the Crismond farm.

G. L. Huffman testified that about 1920, when he was assessor, Mrs. Crismond directed him to assess the buildings on the north eighty to Paul Crismond, saying: "Paul owns the buildings on that place over there and I own the land, and Paul should pay the taxes on the buildings."

It was admitted that Mrs. Crismond was in possession of the land and paid the taxes until her death; facts which have no bearing on the question of adverse possession as against remaindermen, since she

would be entitled to possession and obliged to pay the taxes as life tenant. Such was the evidence in support of the claim that Mrs. Crismond owned the fee by adverse possession.

In this connection it is necessary to note another item of evidence offered by respondents. In 1917, Horace Crismond wanted to borrow money and for the purpose of enabling him to do so his mother deeded the north eighty to him. That deed was not offered in evidence. Horace applied to the Union Central Life Insurance Company for a loan which he failed to get, evidently because of the condition of the title. Thereupon he and his wife, Myrtle, re-conveyed said tract to his mother by deed dated May 21, 1917, and duly placed of record, as had been the deed from his mother to him. From said deed of Horace and Wife to Sarah L. Crismond, the following part was read in evidence:

"It is the purpose of this deed to convey to Sarah L. Crismond, grantee herein, only such right, title and interest in above described real estate, as Sarah L. Crismond conveyed to Horace Crismond by her deed, dated January 4, 1917, filed for record January 8, 1917, and recorded in Book 225, at page 602; and this deed does not convey any right, title, interest or estate owned by or vested in Horace Crismond and Myrtle Crismond, or either of them, prior to the execution and delivery of the aforesaid deed from Sarah L. Crismond to Horace Crismond, the purpose of this conveyance being to restore as between Sarah L. Crismond, Horace Crismond and Myrtle Crismond, the title to the aforesaid real estate exactly the same condition it was in prior to the execution of the deed, recorded in Book 225, page 602, and any interest to the said real estate owned by or vested in grantor therein prior to the execution of said deed, is hereby expressly retained, and any interest that grantors may have in and to above described real estate under and by virtue of deed from Mark Bowling and wife, Elizabeth Bowling, dated May 10, 1860, in Book Q, page 533, is expressly retained by grantors."

The deed from Mark and Elizabeth Bowling referred to in the above excerpt is one of the three Bowling deeds pursuant to which Mrs. Crismond had taken and held title. Horace Crismond in his testimony admitted executing the above mentioned deed to his mother, but sought to evade the effect thereof as a recognition of the existence of an interest in remainder in the land in Mrs. Crismond's children by testifying that he did not direct the lawyer to write therein the provision above quoted and did not know when he executed the deed that it contained such provision. It is apparent from Horace's testimony that he was favorable to appellants' cause. His interest lay that way. He had obligated himself for payment of the debt secured by the deeds of trust and it was to his interest that the entire interest in the land be charged with the payment of the debt. And if he did not know that such provision

was in his deed there is no reason to believe that Mrs. Crismond, the grantee, did not know it when she accepted the deed and had it recorded. Some one must have directed the attorney who prepared the deed to write that significant provision into it. If Horace did not do so then it must have been done by the other party to the deed, Mrs. Crismond herself. That deed thus accepted and placed of record by Mrs. Crismond clearly shows that as late as 1917, notwithstanding she had previously given a number of deeds of trust purporting on their faces to convey the whole title, she was not in fact so claiming as against her children and grandchildren but was expressly recognizing their interests, and it accords with the verbal statements testified to by two other sons. That deed was in the chain of title when appellants took the deeds of trust in controversy and presumably was shown by the abstract of title which the evidence indicates was furnished when the loan was applied for.

From the foregoing it is clear that during all of the time while the Statute of Limitations was running and until long after Mrs. Crismond's possession, which was adverse to all except her children or bodily heirs, had ripened into title, such possession on her part was not intended to be solely for herself and adverse to said children and heirs but was for herself and them in accordance with the title purported to be conveyed by the Bowling deeds.

As further showing that Mrs. Crismond never in fact claimed adversely to her children, one Mrs. Eastman, a sister-in-law of Paul Crismond, testified that in a conversation with Sarah L., about a month before the latter's death, Mrs. Crismond brought up the subject of having mortgaged the land and stated that she knew she should not have mortgaged it in the beginning; that she had only a lifetime interest and that "this land is deeded to my children, and when I am through with it, this will fall to them." That evidence was admitted without objection, but on objection made by appellants' counsel after the question had been answered, the court struck it out on the ground that statements of Mrs. Crismond made after appellants' deeds of trust were given could not be used to impeach the conveyances. The evidence was offered to show that Mrs. Crismond had never claimed more than a life estate, and since appellants had offered evidence of alleged declarations by her tending to show assertion of a greater claim we are inclined to think the evidence was competent to contradict appellants' evidence. But without it the conclusion is amply justified that Mrs. Crismond had not claimed adversely to her children and heirs, at least prior to the vesting of title by limitation.

The question is thus presented, whether, when the possession ripened into title, it was title in fee simple in Sarah L. Crismond or a life estate in her with remainder in her bodily heirs. We have

been unable to find any case deciding the exact question here involved but reference may be made to some which announce principles we think applicable.

In Allen v. DeGroodt, 98 Mo. 159, 11 S. W. 240, the owner of a life estate bought in the land at a sale foreclosing a mortgage given prior to the conveyance by which the life estate was created. It was held that his purchase inured to the benefit of the remaindermen, the court quoting: "A release of a right made to a particular tenant for life, or *in tail*, shall aid or benefit him or them in the remainder. [Co. Litt:, secs. 453 and 267b.]" And further saying that if a tenant for life buy in an outstanding incumbrance upon the estate it will be presumed, nothing to the contrary appearing, that the purchase was made for the benefit of the reversioner or remainderman, as well as himself; citing authorities. If a tenant for life, after a sale of the property for taxes, obtains a release to himself of the right thus acquired, he takes under such release according to his title and the remaindermen according to theirs. [Allen v. DeGroodt, supra, and authorities cited; Mathews v. O'Donnell (Mo.), 233 S. W. 451; Moore v. Simonson, 27 Ore. 117, 39 Pac. 1105.] In the latter case one Whitney had equitable title to certain real estate, the legal title to which was in the Missionary Society of the M. E. Church. Whitney by will left to his wife a life estate in the property, remainder to his daughter Sarah Moore and the heirs of her body. After Whitney's death the widow bought in the legal title, taking same to herself. Suit was brought by Sarah Moore to have the title declared held in trust according to the will. The widow then claimed that she held adversely under her deed from the Missionary Society. There was evidence that when she bought she did so for the remaindermen as well as herself. It was decided that she held the legal title for herself and the remaindermen and she was adjudged to convey to them subject to her life estate in the same proportions as they would take under the will. The court said:

"'It is certainly true, as a general proposition, that if a trustee, mortgagee, or tenant for life, being in possession, purchases in an outstanding title or incumbrance, he cannot apply it to his own benefit; but it in general inures to the benefit of him under whom he entered, or is considered as held in trust for the *cestui que trust*, mortgagor, or him in reversion or remainder.'"

Acord v. Beaty, 244 Mo. 126, 148 S. W. 901, was ejectment for an undivided one-fifth of about eighty-seven and a half acres of land. Plaintiff was the daughter and only heir of Elmore Phillips. One Higby, on July 7, 1871, being the owner of 542 acres of land, made a warranty deed to five grantees, one of whom was Elmore Phillips. The deed was to the named grantees for life, remainder to their heirs and assigns, except as to one whose interest at her

death was to go to her co-grantees. By mistake one hundred acres of land was omitted from the description, but the deed called for 542 acres and the grantees at once went into possession of the whole 542 acres under the deed. In 1879 the grantees in the Higby deed executed a mutual partition deed of all the land, which referred to the Higby deed as conveying all of the land to the named grantees "during their natural lives and to their heirs and assigns forever," expressly making the Higby deed by reference a part of the partition deed. In that partition Elmore Philips got an undivided third of a detached sixty-acre tract and also ninety acres. Thirty acres of the ninety were a part of the one hundred acres not described in the Higby deed. The parties at once took possession separately of the parcels of land respectively allotted to them. Plaintiff was born February 8, 1882. On May 29, 1882, Elmore Phillips conveyed the ninety acres allotted to him to Sparks by warranty deed. Phillips died in 1897. The court said:

"When the partition deed was made in 1879, the parties had no paper title to the omitted hundred acres. Ten years had not elapsed, and they had no title by the Statute of Limitations. They were the owners of it in equity as against the world and no one was disputing their right. It was intended to be included in the deed, but was omitted by mistake. The partition deed recited the Higby deed and made it a part of the partition deed. More than that, the partition deed stated that the Higby deed conveyed the hundred acres, and that such conveyance was for life and then to the heirs of the grantees, except as to the share of Hannah Phillips which went on her death to her co-grantees. When Elmore Phillips conveyed to Sparks in 1882, Sparks and all claiming under him were affected with notice of the contents of the partition deed and of the Higby deed and with notice that the Higby deed was intended to convey the omitted hundred acres. Such being the case, the plaintiff, at the death of her father, if she chose to abide by the partition, was the absolute owner, and entitled to the possession of all the land that was allotted to her father in the partition.

"No one would have had any defense to her claim. Her father had only a life estate therein, and he could convey no more than he had. His rights were fully set out in the partition deed. Thus we see that the fact that the hundred acres were omitted from the Higby deed cuts not the slightest figure in the case. It also follows that the partition was a fair one to all concerned."

The partition was held binding upon the parties not *in esse* because fair and equitable, and in answer to the contention that it was not binding on plaintiff because not fair in that her father got more than his proportion of the one hundred acres omitted from the Higby deed, the court said that "every fact necessary to make the title good by adverse possession appears in the record. At

the date of the Higby deed the grantor therein was *sui juris*, and placed the grantees in that deed in possession of the whole 520 (542?) acres, and adverse possession thereunder has been held ever since. Legal title by adverse possession ripened in July, 1881, twenty-four years before this suit was begun."

The court clearly meant that the legal title which thus "ripened" in July, 1881, was title in accordance with the understanding and claim of the grantees in the Higby deed from the time they went into possession thereunder in 1871 until the expiration of the ten-year limitation period; viz., a life estate in the named grantees with remainder to their heirs, though such heirs, as in the case of plaintiff in that suit, were not born till after such period expired. [See also Charles v. White, 214 Mo. 187, 112 S. W. 545; Bellefontaine Imp. Co. v. Niedringhaus, 181 Ill. 426, 72 Am. St. Rep. 269.]

We are of the opinion that when Mrs. Crismond's possession ripened into title it was the title then claimed and asserted in accordance with the Bowling deeds, and that a life estate became vested in her with remainder in fee to her bodily heirs.

When the title had thus become fixed and the relative rights of the parties determined the life tenant could not thereafter hold adversely to the remaindermen so as to destroy their title and acquire it herself, even had she sought to do so, which, under the evidence, giving it the construction most favorable to appellants, appears extremely doubtful. The verbal statements proved by appellants were general and vague. Owning the land for her lifetime she doubtless did sometimes speak of it as her land. The deeds of trust, nothing to the contrary appearing, might be taken as an assertion of fee simple title. But as against both there is the express recognition of the limited estates in herself and the rights of her children under the Bowling deeds evidenced by the statements to her two sons above referred to and the reservation in the deed of her son Horace to her in 1917. There is no evidence that she ever specifically denied that the children had an interest in the land. But assuming that she did so claim after title had become vested, such claim would be unavailing against the remaindermen. She was entitled to possession and the remaindermen could not maintain an action for possession until the life estate terminated.

"A person having a life estate in property cannot, by his acts or declarations set up pretensions to an absolute estate, so as to make his possession an adverse one to the reversioner or remainderman. The reason of this is that there is no right of action in the reversioner until the particular estate has determined, and the possession of the tenant is entirely consistent with the title of the reversioner. . . . It is impossible, therefore, for the tenant for life to make his possession an adverse one to the claim of one

who has the remainder or reversion.'' [Salmons v. Davis, 29 Mo. 176, 181; Armor v. Frey, 253 Mo. 447, 474, 161 S. W. 829, and cases cited. See also Moran v. Stewart, 246 Mo. 462, 474, 151 S. W. 439; Westmeyer v. Gallenkamp, 154 Mo. 28, 55 S. W. 231; Givens v. Ott, 222 Mo. 395, 121 S. W. 23; Shoultz v. Lee, 260 Mo. 719, 168 S. W. 1146; Mathews v. O'Donnell, supra; Charles v. White, supra; Acord v. Beaty, supra.]

Appellants rely upon Waddell v. Chapman, 292 Mo. 666, 238 S. W. 481, as an authority for the contention that Mrs. Crismond could and did acquire title by adverse possession as against her children even though she held under the Bowling deeds. In that case Ann Ross, who seems to have had only a dower interest, conveyed certain land in 1889 by quitclaim deed to Caroline Spicer and her bodily heirs. In 1893, Caroline Spicer and husband conveyed by warranty deed to a grantor in the chain of title of Laura E. Thomasson, who was the contesting defendant in the case. Defendant Thomasson, by her answer, asserted that she and those under whom she claimed had been in open, adverse and exclusive possession under the claim of record title since 1888. Color of title was not shown in Thomasson by the evidence other than through the deed of Caroline Spicer and husband, but it appears from the opinion that the showing of adverse possession went farther back, at least as far back as to one Carl Ross who was the husband of Ann Ross and had died in 1882. Ann Ross died about the year 1890. It is apparent that the adverse possession claimed by Thomasson and her grantors extended at least as far back as the time of the warranty deed made by Caroline Spicer and husband. The court held that defendant clearly failed in so far as she claimed title through the conveyance by Ann Ross, but that, notwithstanding that conveyance was in her chain of title, she was not thereby precluded from showing a superior title by adverse possession; that defendant Thomasson and those under whom she claimed did not claim simply the life estate of Caroline Spicer or any other person, but claimed ownership in fee, which their chain of title, including the deed made by Caroline Spicer and husband, purported to convey them; and that if the Statute of Limitations did not run against the bodily heirs of Caroline Spicer it was because they were owners in remainder after her death, and that they must show themselves to be such owners in fee in remainder before they could contend that the statute did not run against them until the life tenant died, which they had not done, and could not do as Ann Ross did not own the fee.

It must be borne in mind that in the Waddell case the deed to Mrs. Spicer conveyed only Ann Ross's life estate which terminated shortly after the conveyance was made; and that long before any title could vest by adverse possession in Caroline Spicer, for her-

self or her heirs, she conveyed to another and from that time such other person and his grantees, including Thomasson, claimed adversely to Caroline Spicer and her heirs. The Waddell case does not purport to hold that if the title had become vested as an estate for life in Caroline Spicer with remainder in fee in her bodily heirs *before her conveyance to Thomasson's grantor,* the Statute of Limitations would then have run against such bodily heirs during the life of the life tenant. Neither that case nor the others cited by appellants hold that the possession of a life tenant is or can be adverse to the remaindermen, once that status has become fixed.

VI. Appellants urge that Ivy M. Spratt is estopped to deny the lien of their deeds of trust upon her interest in the land. The evidence relied upon to show estoppel against Mrs. Spratt is her admission in her testimony that at the time the deeds of trust were signed by her mother. the signing having occurred at her mother's house, she, Mrs. Spratt, was in an upstairs room and heard her mother reading aloud the deeds of trust before signing them; that from thus hearing them read she understood their contents and knew her mother was conveying the entire interest in the land to secure a loan from the Commerce Trust Company; and that she made no protest. She testified further, however, that she did not then know what her interest in the land was; that she knew the words ''heirs of her body'' were in the deeds by which her mother acquired the lands, but did not fully understand what the words meant; thought she had a ninth interest. She was not then living with her mother, being there at the time on a visit. It is not shown that she took any part in procuring the loan. Her brother Horace, on behalf of his mother, had first gone to see Mr. Patton, agent of the Commerce Trust Company, about getting the loan, and when arrangements were thus made, Patton brought the papers to Mrs. Crismond's home for her signature, and it was then that Mrs. Spratt overheard the reading of the deeds of trust.

Appellants plead that plaintiffs (and the other respondents) knew that Sarah L. Crismond was about to borrow the money and give the deeds of trust, representing herself to be the owner in fee of the land, and aided and assisted her in so doing and that the Commerce Trust Company relied upon such representations to it of Sarah L. Crismond, and relied upon the fact that respondents represented to it that Sarah L. Crismond was such owner in fee and assisted her in getting the loan and that the loan would not have been made but for such representations. But, except as to Horace, there is no evidence of any such representation by any of the respondents, including Mrs. Spratt, nor is there any evidence that said Trust Company or its agent, Patton, relied on the representations of Mrs.

Crismond or Horace as to her ownership or upon the failure of Mrs. Spratt or other respondents to announce that they claimed an interest in the land. The lender was furnished an abstract of title with the application for the loan and asked nothing more. Absent evidence to the contrary it must be presumed that it relied upon that showing of title.

In Commerce Trust Co. v. Keck, 283 Mo. 209, 223, 223 S. W. 1057, it is said:

"The principal element of an estoppel is that one party by his words or conduct has induced another to do something which otherwise he would not have done, and which will result in loss to him if the inducing party is permitted to act contrary to the words or conduct relied on by the other." [See also Grafeman Dairy Co. v. Northwestern Bank, 290 Mo. 311, 334, et seq., 235 S. W. 435; Springfield Security Co. v. Brown, 275 S. W. 566; Starr v. Bartz, 219 Mo. 47, 117 S. W. 1125.]

The cases cited by appellants on the question of estoppel are not analogous on the facts. We think the trial court rightly denied the plea of estoppel as to Mrs. Spratt.

VII. Appellants charge error in that part of the judgment relating to improvements erected by Paul Crismond, one of the respondents, upon the north eighty. The improvements in question consist of a substantial dwelling house and barn erected by Paul under an agreement with his mother that they were to remain his property. The court fixed the value of the improvements so erected at $200, a low valuation under all the evidence, and ordered that sum paid to Paul out of the proceeds of sale of the real estate, a sale of the land having been ordered because the land was adjudged not susceptible of partition in kind. The effect of the judgment is to leave the improvements a permanent part of the real estate and to pay Paul Crismond the modest sum of $200 therefor in lieu of permitting him to remove them. Appellants insist that the court should have adjudged the buildings to Paul, permitting him to remove them. The latter course would unquestionably have depreciated the value and salability of the land more than the sum awarded for the improvements, to the detriment of all parties concerned. Under the pleadings we think the course pursued was permissible and there is no doubt that it best serves the interests of all parties, including appellants who take Horace Crismond's share.

We are of the opinion that the judgment of the circuit court is correct and should be affirmed. It is so ordered. *Davis* and *Henwood*, *CC.*, concur.

PER CURIAM:—The foregoing opinion by Cooley, C., is adopted as the opinion of the court. All of the judges concur.

PER CURIAM:—In their motion for rehearing appellants assert that the opinion in this case overlooks and is in conflict with Herbst v. Merrifield, 133 Mo. 267, 34 S. W. 571, which they say by inadvertence of counsel was not called to the court's attention in their brief. Appellants argue that the Herbst case holds that where there are two separated tracts of land conveyed by an instrument which amounts to color of title only, possession of one tract will not constitute possession of the other so as to start the running of the Statute of Limitations without a showing of actual possession of the separated tract; and that in the instant case Mrs. Crismond could not have lived on both the eighty acre tracts, hence her statement in her application for loan that she had lived on the land for sixty years prior to 1925 cannot be taken as any evidence that she had taken possession of both eighties as early as 1865.

We, perhaps, should have stated in the opinion that she also said in the application for loan that the land had been cultivated for forty-five years. The whole statement was: "The land has been under cultivation for forty-five years and I have lived on the same for sixty years." She meant, of course, that she had cultivated it that long, as there is no suggestion in the evidence that any one other than herself and husband and her tenants had ever cultivated any of it. Previously in the application the whole 160 acres was described together and referred to as though it were a single tract of 160 acres. Absent any showing or suggestion to the contrary, we think the inference may legitimately be drawn that Mrs. Crismond, when she said she had lived on the land sixty years, meant that she had taken possession of all of it under her deeds that long ago.

In the Herbst case the controversy was between parties claiming title against each other. Plaintiff had good record title and the defendant claimed by limitation but did not show actual possession of the tract in dispute, which was a small parcel two miles distant from the main body of land upon which he lived, nor was there a showing that he had used that parcel in connection with that on which he actually lived.

Moreover, in this case there is no question of adverse claims as between Sarah L. Crismond and appellants. Whatever rights appellants have come through Mrs. Crismond. The question is what title did she claim as between herself and her bodily heirs. Even if her statement as to living on the land could only be referred to the eighty on which the improvements were located, the period during which she had cultivated the land, forty-five years, would

carry her possession of the other eighty back to 1880. The reference to cultivation clearly included all of the land. The improvements, as far back as the evidence shows, were on the south eighty. There is no evidence that the family dwelling house had ever been on the north· eighty. If the actual possession by Mrs. Crismond of the north eighty can only be said to have been shown as far back as 1880, it was still more than ten years prior to the deeds of trust given by her conveying that eighty, the first of which was in 1909, except for the one given when she got the Bowling deeds and which is sufficiently discussed in the original opinion. Appellants' evidence shows Mrs. Crismond's actual possession of the north eighty (as well as of the south eighty) going back at least to 1892, so that in any event her possession had ripened into title as to each eighty prior to the deeds of trust she gave thereon respectively, with the exception, as above stated, of the mortgage given when the Bowling deeds were made.

It is further insisted that the opinion conflicts with Waddell v. Chapman, 292 Mo. 666, 238 S. W. 481, but that question is sufficiently discussed in the original opinion. The motion for rehearing is overruled.