JACOB WELLER, WILLIAM WELLER, JOHN WELLER and ALICE REED (nee Weller), Appellants, v. LOUISA SEARCY (nee Weller), RUDY WELLER and SOLOMON WELLER.—123 S. W. (2d) 73.

Division Two December 20, 1938.

*Roy L. Kay* for appellants.

770

*Irwin, Bushman & Buchanan* for respondents.

COOLEY, C.—Action to determine title to real estate and for partition thereof. The circuit court rendered judgment declaring the title to be vested in defendants Rudy Weller and Louisa Searcy and plaintiff Alice Reed, charging the shares of said Louisa and Alice with a lien of $2000 each in favor of Rudy, ordering partition among those three and sale of the lands and division of the proceeds accordingly. The other plaintiffs and defendant Solomon Weller were adjudged to have no title or interest. Plaintiffs appealed. ▇ The appeal was granted to the Kansas City Court of Appeals, which court transferred the cause to this court on the ground that title to real estate is involved. The action does involve title to real estate. The title is in dispute. Both parties by their pleadings asked for determination of the title and the judgment adjudicates title. The appellate jurisdiction is in this court and the cause was properly transferred here.

The land involved is the southeast quarter of Section Thirteen, Township Forty-five, Range Fifteen, in Moniteau County. It was owned by Joseph Weller prior to his death and occupied by him,

with his family, as his homestead. He died, testate, in July, 1894, leaving a widow, Elizabeth, and eight children, then all minors. One son, Samuel, died thereafter, intestate and leaving no widow or descendants. Plaintiffs and defendants herein are the surviving children and heirs of said Joseph. The widow, Elizabeth, died in 1935. She had not again married. Plaintiffs claim as devisees under the will of Joseph Weller, their claim being that the will gave their mother, Elizabeth, a life estate and that the children took as remaindermen. Defendant Rudy alone answered, claiming that his mother took the fee under the will, also that she acquired title by adverse possession as against the children if she did not get full title by the will and that he and his sisters, Alice and Louisa, took from said Elizabeth by the latter's will; asserting also a claim against his two alleged co-owners for improvements. Solomon Weller was notified only by publication and made no appearance. Louisa Searcy was served with process but filed no answer. The trial court decided the case on the theory that Elizabeth Weller took the full title in fee under her husband's will and also allowed Rudy's claim for improvements.

Omitting formal parts and attestation, Joseph Weller's will reads:

"I, Joseph Weller of the County of Moniteau and State of Missouri being of sound mind and memory and over the age of Twenty-one years do make and publish this my last will and testament.

"1st. First, I will and desire that all my just debts and funeral expenses be first paid.

"2nd. Second, I desire that my wife, Elizabeth Weller, take of my estate all that part of my estate to which she may be entitled under the law in force at the time of my death, as her absolute property. I also will and devise that my said wife take and retain all the remainder of my property to be by her used and applied to the support of all my children as their needs may require, during her natural life and widowhood, but in case my said wife should marry again, I will and desire that all my property be sold and the proceeds of said sale be equally divided between all my children share and share alike, but in case my said wife shall not again marry, I will and desire that at the death of my said wife, all my property that may be left on hand at her death be sold and the proceeds of said sale be equally divided between all my children share and share alike."

The will was duly probated, but there was no other or further administration of the estate of said Weller (whom we shall refer to hereafter as testator). The land in question was not encumbered at testator's death. He had no other real estate. He left no debts. His personal estate was not large, consisting of his household effects,

sufficient farm machinery and equipment, about five horses, eight or ten cattle, some hogs ("a small bunch") and a fair supply of family provisions, grain, hay, etc. Whether or not the value of the personal estate exceeded the amount to which the widow would have been entitled absolutely, as statutory allowances, had testator died intestate, does not clearly appear. Facts bearing particularly on the claim of adverse possession and the claim for improvements will be stated later.

We are first confronted with a motion to dismiss the appeal, filed by respondents. The motion challenges the sufficiency of appellants' abstract of the record on the ground that it does not state when and in what court the suit was filed, and is not properly indexed because there are exhibits (respondents say twelve) "distributed" through the 160 pages of the abstract which are not "specifically identified" in the index, as required by our Rule 13. He also says that appellants' brief is too vague and indefinite in its "Assignment of Errors" and "Points and Authorities" to comply with our Rule 15.

As to the abstract, it must be conceded it is somewhat deficient in the respects mentioned though not so much so as respondents claim. True, it does not state, as it should, when and where the suit was filed, nor that process was issued and served. It does, however, set out the judgment and the appeal orders, from which it appears that the cause was tried in the Moniteau County Circuit Court and judgment rendered and appeal allowed by that court. From recitals in the judgment we also learn that the parties (except Solomon Weller) appeared and went to trial without objection, and that said Solomon had been notified by publication in a paper "published in Moniteau County, Missouri." Also, appellants filed in the Kansas City Court of Appeals a complete indexed and certified transcript of the record proper (though typewritten, not printed as specified in our Rule 14), which was transferred here with the case, and which shows the filing of the original petition in the Circuit Court of Moniteau County and process issuing out of that court. Moreover the pleadings show that the land involved is in Moniteau County and the suit could have been properly brought only in the circuit court of that county. [Sec. 1548, R. S. 1929, Mo. Stat. Ann., p. 1730 (partition) ; Sec. 722, R. S. 1929, Mo. Stat. Ann., p. 934 (to determine title).] In view of all this, though the abstract should have stated when and where the suit was filed, and though the transcript of the record proper above referred to was typewritten instead of printed, we decline to dismiss the appeal because of the omission of the abstract to state the time and place of filing the suit. (We do not intend this ruling as a holding that under Rule 14 a typewritten transcript may be substituted for

the printed transcript called for by the rule when the procedure there indicated is adopted.)

As to the index, Rule 13 requires that it shall "specifically identify exhibits where there are more than one." The index to appellants' abstract refers to "notes of Solomon Weller paid by Elizabeth Weller, during the minority of Rudy Weller," giving the pages of the abstract. On those pages we find eight notes set out. Respondent does not seem to complain of the sufficiency of the index as to those exhibits, but says there were some four other exhibits introduced which are not indexed. We find in the abstract testimony of a witness, C. C. Treiber, Circuit Clerk and Recorder, relative to two or three deeds of trust (satisfied of record) a sheriff's deed under execution and a deed from Louisa Searcy to Elizabeth, Alice and Rudy Weller. The record shows that those instruments, while formally introduced, were not copied or called for in the bill of exceptions. The Recorder had the record books before him while on the witness stand and at the request of counsel read therefrom such portions of those conveyances as were deemed material in the case. All that could be material of those conveyances in the instant case was thus put in the record, and that evidence is sufficiently indexed.

As to the brief, our Rule 15 requires an appellant to state in his brief, in numerical order, "the points relied on," with citation of authorities thereunder. Appellants' "Points" appear under the caption "Points and Authorities." Each has its separate heading or sub-title in bold face type. They are not *numbered* and some of them are stated too abstractly but there are enough that we regard as sufficiently stated to present the points which are decisive of the case. The abstract and brief cannot be recommended as models but we are of opinion that their defects are not such as to justify the drastic penalty of dismissal of the appeal. The motion to dismiss the appeal is denied.

Respondents' contention as to the meaning and effect of testator's will is thus succinctly stated in their brief:

"The will of Joseph Weller gave to Elizabeth Weller 'all that part of my estate to which she may be entitled under the law in force at the time of my death, as her absolute property.' And respondents contend that, it being shown by the record that the land in question was the homestead of Joseph Weller in his lifetime, Elizabeth Weller took said land in fee simple absolute; and that the sentence following, devising all the remainder of testator's property to Elizabeth Weller during her lifetime with remainder over to his children, did not, under the rules of construction established by this Court, reduce or diminish the estate in fee given by the first sentence of the paragraph."

At the time testator's will was written, February 21, 1890, and at the time of his death his widow, had he died intestate, would have been entitled to dower and to homestead rights in his realty. By the law then in force, Section 5439, Revised Statutes 1889, the homestead· right of the widow was a life estate (for her natural life) in the lands which had belonged to the husband as a homestead, not exceeding in area 160 acres nor in value $1500. Having children by her said husband living, she could, by statutory election, have taken absolutely a share in the real estate equal to the share of a child, in lieu of dower. [Secs. 4523, 4524, R. S. 1889.] (She did not so elect.) She was entitled, also, to a share in the personal estate equal to that of a child. [Sec. 4517, R. S. 1889.] Under Sections 105, 106, 107 and 108, Revised Statutes 1889, she was entitled, absolutely, to certain allowances out of the personal estate which, in this case, would probably have consumed all of the personal estate.

Respondents attempted to show that the 160 acre tract did not exceed in value $1500, and that therefore, being within the statutory limit as to area, it was all homestead, and they contend it was intended by the testator to be included in the language "all that part of my estate to which she may be entitled under the law," and that he meant to give it to her as her "absolute property." And they contend that all that part of the real estate which would thus fall within the area of the homestead was thus carved out and given absolutely to the widow and was not intended by the testator to come within or be affected by the subsequent provisions of the will which, as they concede, created a life estate in the land to which they may apply in the widow with remainder in the children; in other words, as we understand respondents, that the whole homestead tract was entirely segregated from and not intended to be in any way or to any extent included in the "remainder" of his "property" which the testator devised to his wife for life or widowhood, and that those provisions (as to a life estate, etc.) do not apply to the homestead tract or any interest or estate therein.

The evidence regarding the value of the 160 acres at the time of testator's death leaves said value, as might be expected, somewhat indefinite. Two or three witnesses, who testified as to financial and economic conditions in 1894, estimated the then value of the tract at about $1800. Others placed it somewhat higher. A fair summary would indicate a value not greatly in excess of the homestead limit of value, $1500. A considerable part of the land had not been cleared of timber and brush. So, even if the homestead did not include, in extent, the whole tract, there would have been comparatively little left, and that little probably unproductive, as the "remainder of his estate" which alone, respondents say, was intended by the tes-

tator to be given for life to his widow "to be used and applied to the support" of his (then eight) minor children and ultimately divided amongst them. If we keep in mind that the widow, by statute, Section 4533, Revised Statutes 1889,. had the legal right to remain in and enjoy the "mansion house . . . and the messuages or plantation thereto belonging" without paying rent, until dower should be assigned, which might have been ten years, and thus, by the logic of respondents' argument, include all the land to the possession and use of which the widow would have been entitled under the law, there would have been nothing left, for such quarantine right would have extended to the whole tract. [See Moore v. Hoffman, 327 Mo. 852, 39 S. W. (2d) 339.] Respondents do not mention the widow's quarantine right. Perhaps they do not mean to claim that it should be considered in determining "that part of my estate to which she may be entitled under the law" which they say the testator meant to give his wife "as her absolute property," or in delimiting the territorial extent or boundaries thereof, since quarantine, unlike the then statutory homestead, is not an estate for life but terminates upon assignment of dower or when the right thereto becomes extinct. [Moore v. Hoffman, supra.] But they do so contend as to the homestead.

The law did not give the widow the homestead absolutely. It gave her a life estate in a quantity of land, not to exceed the specified acreage and value, which, as to acreage, was, if necessary, to be ascertained by proceedings provided for by the statute. Under the evidence in this case, the land owned by testator exceeded—not greatly, yet to some extent—the maximum statutory value of a homestead. The evidence indicates that in 1890, when the will was written, this land was worth, perhaps, somewhat more than when testator died, in 1894—though not enough more that the excess over homestead would have provided much for support and education of testator's eight children, some of them quite young. These facts, among others, must be kept in mind in seeking the testator's meaning and intent. In view of this situation the interpretation of the will contended for by respondents would present uncertainty as to the quantity of land —and its boundaries—devised to testator's wife "as her absolute property;" perhaps not an unsurmountable obstacle, since "that is certain which can be made certain," but nevertheless a fact to be kept in mind in seeking the testator's intent from the language of his will, as we must do.

Respondents say that a devise of real estate "absolutely" or as "absolute property," *without more,* suffices to convey the fee simple title. That is true. It is also true, as they argue, that a devise of real estate, in terms apt and sufficient to pass the fee and

which, standing alone, would pass the fee, will not be cut down to a lesser estate by subsequent words of uncertain import. LAMM, J., speaking for the court in Cox v. Jones, 229 Mo. 53, 63, 129 S. W. 495, thus stated the rule:

"If a devise of an estate be made to a given devisee, the estate granted may not, in words following, be cut down to a less estate by use of ambiguous words inferential in their intent. For example, a fee simple estate once granted will not be cut down by such mere ambiguous and inferential words following to a fee tail, or one for life. *E converso*, if an estate be granted in one clause of the will its quantity may be cut down to a lesser estate by an express provision to the effect, or by words so strong and clear as to have that effect by plain and necessary implication."

It is also well settled that the cardinal rule for construction of wills is to ascertain the testator's intention from the language of his will—not one part alone but from the "four corners" thereof—and so to construe it, if possible, as to give effect to all its provisions. "When the intent of its maker is discovered, the will is solved, unless that intent runs counter to an inflexible rule of law or public policy." [Burnet v. Burnet, 244 Mo. 491, 497, 148 S. W. 872.] And in endeavoring to ascertain the testator's intent the court may, so far as is possible, put itself in the testator's position and view the situation from his standpoint.

▪ It is not to be presumed that testator was without affection and solicitous regard for his children. If respondents' theory be correct he practically disinherited them, and his subsequent provisions meant little or nothing of substantial effect. On the other hand, if by the language "all that part of my estate to which she may be entitled under the law" he meant only such property and rights as the law would give his widow absent a will, in other words such estate and interests as would be absolutely hers under the law, the provisions of the will immediately following have a real meaning and a substantial effect, and that he intended them to have substantial effect cannot be doubted. He gave "all the remainder" of his property to his wife, to be by her used and applied to the support of his children as their needs might require, "during her life *and widowhood,* but in case my said wife should marry again, I will and desire that *all my property* be sold, and the proceeds of said sale be equally divided between my children share and share alike." (Italics ours.) Note, he says in this sentence that in case of his wife's remarriage *all* his property is to be sold—referring to it all as *his property,* not as though he considered he had made it hers by his devise to her in the first sentence. He then further provided that at his wife's death, if she had not again married, all that

then remained—again using the language "all my property,"—shall be sold, etc.

In Hallstrom v. Swaine (Mo. App.), 115 S. W. (2d) 159, the St. Louis Court of Appeals had for construction a clause of a will reading:

"Fourth: To my wife, Nellie Swaine, I give all property which she would be entitled to have and to receive from my estate according to the laws of the State of Missouri if I had died intestate."

The widow contended that she was entitled to what the law would have given her had there been no will and in addition to a portion under the will equal to what she would have received by law without the will. The court denied her claim, holding that the language used by the testator was his "way of relegating the widow to take out of the estate all which the law would give her in the event he had died intestate," and no more.

In 69 Corpus Juris, page 283, section 1306, it is said: ". . . it is generally held that, where the will gives to the widow 'her lawful part,' 'what the law allows her' or words of like purport, she is entitled thereunder to such part of the testator's estate as she would have received if he had died intestate." In Barr v. Weaver, 132 Ala. 212, cited in Hallstrom v. Swaine, supra, the provision of the will under consideration was, "I give to my beloved wife, Elizabeth P. Weaver, such part or portion of my estate as she may be entitled to under the laws of Alabama, and in addition . . ." the use of a certain house till the youngest child should reach the age of twenty-one years. It was held that the widow took, under the above quoted provision, only what she would have received had there been no will, and that the statutes relating to dower and to descents and distributions must be looked to for the measure of her estate.

Respondents stress the use by testator of the words "as her absolute property" in the first sentence of the 2nd paragraph of the will as indicative of an intent to give his wife absolutely all of the real estate in which, under the homestead law, she would have had but a life estate as surviving widow had he died intestate. We do not attribute such intent to that language. In view of the provisions of the will as a whole we are satisfied he meant by that provision of the will such property and rights as would be hers—her absolute property—under the law. A life estate, such as the then life estate in the homestead—is property. So also, of course, are the statutory allowances in the personal estate. The circumstances all considered we hold that the widow, Elizabeth Weller, held, under her husband's will, a life estate in the land in question and that, subject thereto, the fee vested in the children.

Respondents, as we have stated claim that defendants, Rudy and Louisa, and plaintiff Alice, took the entire tract by devise from their mother, Elizabeth. Elizabeth's purported will was read in evidence—over plaintiff's objection—and it purports to devise to those three "all my interest in . . ." said land, describing it. But there is no proof in the record that said purported will was ever probated or established as the last will of said Elizabeth. If it was, it would pass nothing so far as concerns title derived by Elizabeth directly through her husband's will, since her life estate terminated at her death. But it would pass some interest in the fee, because:

One child, Samuel, died intestate and without descendants after his father's death. His interest in the fee thereupon passed by inheritance to his surviving mother, brothers and sisters. Elizabeth thus acquired one-eighth of Samuel's share. It appears, also, that in 1908 Elizabeth Weller obtained a judgment against Solomon Weller, under which execution issued and was levied upon Solomon's interest in this land and his interest was sold to Louisa Weller (now Searcy), the sheriff's deed being dated September 11, 1908. Those proceedings are not sufficiently shown to enable us to tell whether or not they were regular and sufficient. The parties seemed so to treat them, and if they were the sheriff's deed passed Solomon's interest to Louisa. By deed dated September 17, 1908, Louisa conveyed three-fourths of the interest she thus acquired (but only that) to Elizabeth, Alice and Rudy Weller. Elizabeth thus acquired another small interest in the fee. Those interests she owned at the date of her purported will, August 22, 1911, and at her death in 1935, so far as the record before us shows.

The circuit court made no finding on the issue of adverse possession raised by Rudy Weller's answer, probably because it held that Elizabeth Weller took the fee simple title under her husband's will, in which case her title would not need to be bolstered by proof of adverse possession. In view of our holding that under said will she held only a life estate it may be well for us to notice the claim of adverse possession.

Elizabeth remained in possession of the land from her husband's death until her own death. Until about 1915 she appears to have managed it herself, carrying on the usual farming operations and business. Her youngest son, Rudy, who was about four years old when his father died, remained with her and, after he got big enough, helped her. The other children also remained till they respectively reached their majority, after which, one by one, they drifted away to places of their own. About 1915, after Rudy had become of age, he rented the place from his mother, paying her thereafter $300 a year rental until her death. Of course his possession was her pos-

session. On the question of adverse possession respondents cite and rely on Moore v. Hoffman, supra. In that case the husband had died intestate, his widow, the plaintiff, thereupon becoming entitled to dower and quarantine rights. By the death of a daughter, without issue, some three years later, she became owner of a one-fourth interest in fee. She remained in full possession, exercising all rights of ownership, until the suit was brought, thirty-seven years later. This court held that her dower and quarantine rights expired ten years after her husband's death, no proceedings for assignment of dower having been instituted (see Sec. 363, R. S. 1929, Mo. Stat. Ann., p. 235); that up to the time of such expiration "she had been rightfully in possession under her dower and quarantine rights and her possession *was not adverse to the rights of the heirs*" (italics ours), but that from that time on she and her living daughter, a defendant, had been at most tenants in common of the land. The court pointed out that there was sufficient evidence to justify a finding of title by adverse possession acquired by the plaintiff as against a cotenant in common after the expiration of her right of possession under her dower and quarantine rights. But that decision lends no support to the contention that title may be so acquired by a life tenant as against the remaindermen. The language we have italicized above indicates the contrary.

The evidence as to a claim of absolute ownership by Elizabeth Weller is too vague and unsubstantial to justify a finding of title in her by adverse possession, even had she been a tenant in common claiming against cotenants in common and not entitled to full possession as tenant for life. It consisted mostly of hearsay, rumor and conclusions, indefinite and uncertain. Moreover, such actual expressions—or claims—of hers as were proved indicate that she was not claiming absolute title as against the remaindermen. In her purported will, made in August, 1911, she says "all my interest in" said quarter section, describing it. She then had some interest in the fee, as we have pointed out, derived by inheritence from Samuel and through Louisa's deed conveying part of Solomon's interest. In December, 1911, she, Louisa, Alice and Rudy gave a deed of trust conveying "four undivided one-seventh interest and also the right title and interest of the said Elizabeth Weller in and to" the said land. But we need not further detail the evidence on this issue. A life tenant, entitled to and in possession as such, cannot acquire absolute title in fee as against the remaindermen by adverse possession. The life tenant's possession, being of right, is not adverse to the remaindermen. [Crismond v. Kendrick, 325 Mo. 619, 641, 29 S. W. (2d) 1100, 1110 (12), and cases cited.]

The question of allowance for improvements is not stressed in the briefs, being barely referred to by appellants and not mentioned by respondents. But since the judgment appealed from was in effect an interlocutory judgment in partition and further proceedings will be necessary in the circuit court perhaps we should discuss it briefly. There was evidence that about 1904 Solomon, being then of age, bought a threashing machine—wherein he failed to exhibit the wisdom attributed to the Biblical character whose name he bore— and gave eight notes, aggregating $2258.75 for the purchase price, his mother signing them as surety. She had to pay them, the last one being paid in 1908. What became of the threshing machine is not shown—nor what, soon thereafter, became of Solomon. The evidence raises at least a strong inference that along about that time Solomon forged a note for some $750 or so, and soon thereafter left for parts unknown. Mrs. Weller paid that note also, though not legally obligated to do so. The record is vague as to whether or not those items were taken into consideration by the court in determining the amount, $6,000, allowed in favor of Rudy as the value of "improvements," of which two-thirds was charged against the shares allotted to Louisa and Alice, that is, one-third, $2,000 against each. Rudy, in his testimony, seemed to contend that he had helped pay those notes, but it is not clear whether he meant by money of his own or money which he helped his mother make by his work on the farm. He did stay on the farm and work. He was a dutiful son, industrious and frugal and apparently had business ability, as he seems to have prospered financially. But he was a minor during those years and his services were due his mother. Those items certainly do not come under the head of improvements of the farm and they could hardly be considered as having been part of the testator's estate "used and applied to the support of the children," within the contemplation of the will, even if Rudy could claim what, if anything, his mother had so expended. There is no evidence that Solomon was mentally or physically unable to support himself. If those items were not considered it is difficult to figure out $6,000 worth of improvements such as, on any theory, could be charged against the shares of Rudy's cotenants in common, even on his own testimony. He spoke of paying the taxes, and for insurance, but on cross-examination virtually admitted that his mother paid those items. It was her duty as life tenant to do so, and she had the money with which to do it. In 1915, after Rudy became of age, he bought his mother's stock, paying her $650 therefor and thereafter for twenty years (until her death), paid her $300 a year rental, a total of $6650. She had but $50 when she died. Her personal expenses must have been small—she continued living

on the farm, with Rudy. He testified to her having paid doctor's bills, aggregating some five or six hundred dollars, perhaps somewhat more, and something for dress, amount not estimated but evidently small.

During the time between testator's death and the widow's death one room was added to the house, a hen house was built, and the house and barn were re-roofed and twice painted. Rudy's testimony indicates that Mrs. Weller paid for the painting and the roofing, except for such labor as Rudy performed. He also testified about the expense of keeping up the fences, part, at least, of the materials for which seem to have been paid for by Mrs. Weller. From the record before us it would be impossible to figure out what sum, if any, could legitimately be charged in favor of Rudy against the shares of the other tenants in common on account of permanent improvements. It is the duty of the life tenant to pay the taxes accruing after his tenancy begins, Hall v. French, 165 Mo. 430, 65 S. W. 769, Fountain v. Starbuck (Mo.), 209 S. W. 900, Witcher v. Hanley, 299 Mo. 696, 253 S. W. 1002, and to make ordinary repairs. [Witcher v. Hanley, supra; Larsen v. Hansen (Mo. App.), 12 S. W. (2d) 505.] It has been held, also, that a life tenant cannot charge the *corpus* of an estate with improvements. [Gray v. Clement, 296 Mo. 497, 246 S. W. 940.] In Staub v. Phillips, 307 Mo. 576, 271 S. W. 365, it was held, in an action under the ejectment statute, that a life tenant, who in good faith made permanent improvements believing himself the owner in fee, was entitled to recover therefor (and on this question see also Gray v. Clement, supra), but the evidence in this case is not sufficient to show that Mrs. Weller made improvements in such belief and, moreover, she is not here seeking recovery. Rudy is not claiming, as we understand his position, for improvements made by his mother, but for improvements made by himself.

The judgment is reversed and the cause is remanded, for further proceedings consistent with the views herein expressed. *Westhues* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All the judges concur.